730 A.2d 221

Darwin GREEN, a Minor, etc., et al.

v.

NORTH ARUNDEL HOSPITAL ASSOCIATION, INC., et al.

No. 538, Sept. Term, 1998.

Court of Special Appeals of Maryland.

May 26, 1999.

Suzanne C. Shapiro and Scott E. Nevin (Saul E. Kerpelman & Associates, P.A., on the brief), Baltimore, for Appellants.

Megan M. Auchincloss (Richard McMillan, Jr., Luther Zeigler and Crowell & Moring, LLP, on the brief), Washington, DC; Curtis H. Booth (Kurt D. Karsten and Cowdrey, Thompson & Karsten, P.A., on the brief), Annapolis, for appellee, North Arundel.

Gregory L. VanGeison (E. Dale Adkins, III, Lynne B. Malone and Anderson, Coe & King, LLP, on the brief), Baltimore, for appellee, Mody.

Larry A. Ceppos (Sharon A. Marcial, Jared S. Littmann and Armstrong, Donohue & Ceppos, Chtd., on the brief), Rockville, for appellees, Fields and Axelbaum.

Argued before WENNER, SALMON, and JAMES S. GETTY (Retired, specially assigned), JJ.

SALMON, Judge.

Darwin Green (Darwin), a disabled minor child, through his parents and next friends, Teresa Johnson and Charles Johnson (appellants), instituted a medical malpractice action against North Arundel Hospital Association, Inc. (NAH); Richard T. Fields, M.D.; Stewart P. Axelbaum, M.D.; and Harshad R. Mody, M.D. (appellees).[1] Appellants claimed that appellees breached the applicable standard of care by failing to diagnose an alleged shunt malfunction in Darwin on August 18, 1988, and that a proper diagnosis would have prevented the child's subsequent injuries that have left him in a chronic vegetative state.

Appellants filed their original complaint in the Circuit Court for Baltimore City and named only NAH and Dr. Fields as defendants. Dr. Fields resides and carries on business solely

---

1. Appellants also named the University of Maryland Medical System, University Hospital, as a defendant in the suit. Darwin's parents subsequently signed a joint tortfeasor release against the University of Maryland in exchange for a payment of $1,489,000.

in Anne Arundel County; NAH conducts business solely in Anne Arundel County. On March 20, 1992, Baltimore City Circuit Court Judge Richard T. Rombro ruled that appellants had filed their suit in the wrong venue and transferred the action to the Circuit Court for Anne Arundel County.

The Anne Arundel County Circuit Court set a trial date for June 1994. On May 17, 1994, appellants moved to stay the Anne Arundel County proceedings because they wanted to add two new defendants to the case—Drs. Mody and Axelbaum. As required by title 3, subtitle 2A, of the Courts and Judicial Proceedings Article of the Maryland Code (1998 Repl. Vol & Supp.1998), appellants initially filed their claims against Drs. Mody and Axelbaum in the Health Claims Arbitration Office on May 20, 1994.[2] After the parties agreed to waive arbitration in December 1995, the arbitration panel chairman signed a transfer order on February 20, 1996, allowing appellants to proceed with their case against Drs. Mody and Axelbaum in circuit court.

Rather than moving to lift the stay in the Anne Arundel County action by adding Drs. Mody and Axelbaum to that pending case, appellants filed a new complaint in Baltimore City Circuit Court. Appellants' basis for filing in Baltimore City was that Dr. Mody regularly conducted business and maintained his medical office there. In the Baltimore City complaint, appellants not only named Drs. Mody and Axelbaum as defendants, but they also set forth claims against NAH and Dr. Fields—the same claims already pending in the Circuit Court for Anne Arundel County. On June 3, 1996, Baltimore City Circuit Court Judge David B. Mitchell granted appellees' motion to dismiss and imposed sanctions against

---

**2.** Title 3, subtitle 2A, of the Courts and Judicial Proceedings Article of the Maryland Code (1998 Repl.Vol. & Supp.1998) requires certain medical malpractice claims to be submitted to the Health Claims Arbitration Office for an initial ascertainment of liability and damages before the case can proceed in circuit court. *See Attorney Gen. v. Johnson,* 282 Md. 274, 275, 385 A.2d 57 (1978), *overruled in part, Newell v. Richards,* 323 Md. 717, 594 A.2d 1152 (1991).

appellants.[3]

Meanwhile, on February 22, 1996, appellants made a motion in the Anne Arundel County Circuit Court to transfer that pending action back to Baltimore City. On August 2, 1996, Circuit Court Judge Lawrence H. Rushworth held a hearing on the motion. At the time of that hearing, neither Dr. Mody nor Dr. Axelbaum had been added to the Anne Arundel County action. Judge Rushworth denied the motion to transfer at the conclusion of the August 2nd hearing.

On August 9, 1996, appellants amended their original complaint by naming Drs. Mody and Axelbaum as defendants in the Anne Arundel County action. Dr. Mody was served with process on August 19, 1996. The record is unclear as to when Dr. Axelbaum was served with process, but he filed an answer to the amended complaint on September 17, 1996; Dr. Mody filed his answer two days later. At no time after August 9, 1996, did appellants renew their motion to transfer the case back to Baltimore City.

On October 30, 1996, Judge Rushworth bifurcated the case on the issues of liability and damages. Subsequently, the trial judge held a hearing on appellees' motion in limine to exclude Darwin from the courtroom during the liability portion of the trial. After hearing arguments and watching a videotape of a day in Darwin's life,[4] Judge Rushworth granted the motion, finding that Darwin did not have the ability to communicate with his attorneys, nurses, or parents; that he would be unable to provide any assistance to his attorneys in preparing his case; that he would be unable to understand or comprehend the proceedings; and that his presence served no purpose other than to prejudice the jurors against the defendants.

---

3. No appeal was filed from Judge Mitchell's dismissal of the Baltimore City action.

4. After watching the videotape, the court observed that Darwin was bound to a wheelchair, required twenty-four hour medical attention from nurses, breathed through a hole in his neck, and had to be fed via a feeding tube approximately every two hours.

Trial commenced on October 7, 1997. At the conclusion of plaintiffs' case, on October 17, 1997, Judge Rushworth granted NAH's and Mody's motions for judgment. The jury returned a verdict in favor of Drs. Fields and Axelbaum on October 21, 1997, having concluded that neither doctor "departed from accepted standards of care in the treatment of Darwin Green."

Appellants filed this timely appeal and present four questions for our review:

1. Did ... the Circuit Court for Baltimore City err as a matter of law in transferring [a]ppellants' action to Anne Arundel County ...?

2. Did ... the Circuit [C]ourt for Anne Arundel County err in denying [a]ppellants' motion to transfer [their] action back to the Circuit Court for Baltimore City once Dr. Mody was added to the action?

3. Did the trial court err as a matter of law in barring the [p]laintiff, Darwin Green[,] from attending his own trial as a result of his physical and mental disability, in that such exclusion violated the Americans With Disabilities Act, as well as fundamental notions of equal access to justice?

4. Did the trial court err in allowing [a]ppellees to present a theory of their case that is against Maryland case law as stated in *Mehlman v. Powell?*

We answer all of the questions in the negative and affirm.

## FACTS

Darwin Green was born on February 12, 1977, with a medical condition called hydrocephalus. Hydrocephalus causes increased pressure on the brain due to an excessive accumulation of fluid. When Darwin was nine days old, doctors placed a shunt in the right ventricle of his brain that drained the extra fluid to another part of his body in order to prevent the build-up of intracranial pressure.

In 1981, when he was approximately four-and-a-half years old, Darwin complained of headaches and vomiting. Doctors determined that Darwin's shunt was not functioning properly

and performed surgery to correct the problem. For the next several years, Darwin experienced no problems with his shunt.

On the morning of August 17, 1988, Darwin was with his father when he began complaining that he had a headache. Darwin's father gave him Tylenol and later testified that it was not unusual for Darwin to have headaches and that Tylenol normally cured the problem. On this day, however, the Tylenol did not work, and Darwin continued to complain of a headache. Later that day, Darwin felt nauseous, began vomiting, and refused to eat. His father continued to give him Tylenol, but Darwin's condition did not improve.

The next morning, August 18, 1988, Darwin was still complaining that he had a headache. In addition, Darwin appeared drowsy and was still refusing to eat. Darwin's father gave him another dose of Tylenol but this again failed to relieve the child's symptoms. At this point, Darwin's father became very concerned and decided to take his son to the emergency room at nearby North Arundel Hospital, located in Anne Arundel County.

Darwin and his father arrived at the hospital at 11:05 a.m. Dr. Fields, the on-call physician in the emergency room, examined Darwin at 1:00 p.m. At that time, Darwin was complaining of a severe headache. Dr. Fields ordered several laboratory tests, including an emergency CT scan. Darwin was also given Vicodin, a prescription pain killer.

Darwin's CT scan was reviewed by Dr. Axelbaum, a radiologist at NAH. Dr. Axelbaum noted the presence of shunts in Darwin's brain as well as a number of other abnormalities, but he interpreted these results as all old changes. Dr. David Buchholz, appellants' medical expert, later opined at trial that Dr. Axelbaum breached the standard of care when he reported that the changes were all old while failing to report to Dr. Fields that there was a possibility that the results could represent new change or a blocked shunt.

Dr. Fields contacted Dr. Mody, the neurologist on-call at the hospital. Dr. Mody advised that Darwin could be released once his headache was relieved. It is unclear when Dr.

Axelbaum placed his written findings in Darwin's emergency room ("ER") chart. Dr. Buchholz later testified that if Dr. Axelbaum's findings were not in the ER chart when Dr. Fields spoke with Dr. Mody, then neither Dr. Fields nor Dr. Mody breached the standard of care. If Dr. Axelbaum's findings were in the chart and Dr. Fields read it to Dr. Mody, then Dr. Fields also complied with the standard of care, according to Dr. Buchholz. Dr. Buchholz said, however, that if Dr. Axelbaum's notations were on the chart and Dr. Fields failed to read them to Dr. Mody in their entirety, then Dr. Fields would have breached the standard of care. Dr. Buchholz could not say which of these three scenarios actually occurred.

At 2:45 p.m., Darwin's headache was gone, and he was able to tolerate fluids. Dr. Fields consulted with Dr. Lee, Darwin's primary care pediatrician, who informed Dr. Fields that he would see Darwin in his office for a follow-up the next day. Dr. Fields's final diagnosis was a "vascular headache." He released Darwin from the hospital at 3:05 p.m. with instructions to follow up with Dr. Lee the next day. Darwin then left the hospital and went to his father's home, located in Anne Arundel County.

After his release from NAH, Darwin continued to complain of a headache at his father's home. That evening, his father gave him another Vicodin as prescribed by Dr. Fields. The next morning, August 19, 1988, Darwin was still complaining of a headache. His father took Darwin to Dr. Lee's office in Anne Arundel County for his follow-up appointment. Dr. Lee examined Darwin and noted that he had a headache, appeared drowsy, and had a staggering gait. Dr. Lee contacted Darwin's neurosurgeon, who referred Darwin to the University of Maryland Hospital, located in Baltimore City.

Dr. Buchholz was later to testify that Darwin's condition at Dr. Lee's office was "worse" than it was the day before at NAH and that the worsening of his condition was related to increasing intracranial pressure caused by his still undiagnosed shunt malfunction.

Darwin and his father arrived at the University Hospital at 3:55 p.m. on August 19, 1988. The University Hospital ER records note that Darwin was weak, drowsy, and lethargic; that he walked well the day before but "today can hardly walk by himself"; and that his headache was "worse today." Darwin's shunt was tapped[5] in the emergency room and a CT scan was performed. The shunt tap revealed that Darwin had increased intracranial pressure. From this information, emergency room doctors correctly diagnosed Darwin as having a probable shunt malfunction, and at 11:05 p.m., Darwin was admitted to the neurosurgery service of the University Hospital. Corrective surgery was not performed immediately, however, and the next day, August 20, 1988, Darwin experienced a cardiac arrest as a result of his shunt blockage. Doctors were able to revive and stabilize him, but the cardiac arrest caused extensive and irreversible damage to Darwin's brain. This damage has left Darwin in a permanent vegetative state.

Dr. Buchholz's expert opinion was that, given Darwin's medical history and the symptoms that he was exhibiting at NAH, the doctors should have performed a shunt tap on Darwin on August 18, 1988. According to Dr. Buchholz, if a shunt tap had been performed at NAH, it would have revealed that Darwin had increased intracranial pressure at that time. This information would have led the doctors to the proper diagnosis that Darwin's symptoms were caused by shunt malfunction. Dr. Buchholz opined that once a correct diagnosis had been made, if Darwin had been properly managed from that point on and received a shunt revision,[6] then his subsequent cardiac arrest on August 20, 1988, could have been avoided.

In addition, Dr. Buchholz testified that, between the time of Darwin's discharge from NAH and his arrival at the University of Maryland Hospital in Baltimore City, Darwin had in-

---

**5.** A shunt tap is a diagnostic test that allows doctors to determine if a shunt is working properly.

**6.** A shunt revision is a procedure that repairs or replaces a malfunctioning shunt.

creased symptoms from his intracranial pressure, but his injuries were not irreversible at that point. According to Dr. Buchholz, if a shunt revision had been done at University Hospital on August 19, 1988, or during the morning of August 20, 1988, Darwin would have avoided his cardiac arrest and would not have suffered any permanent injury. Dr. Buchholz admitted, however, that if Darwin had been referred to the University of Maryland Hospital by NAH on August 18, 1988, there was no evidence that his course of treatment at the University of Maryland Hospital would have been any different, other than that his treatment would have started twenty-four hours earlier.[7]

## *ANALYSIS*

### *Issue 1*

A. *"Where the Cause of Action Arose"*

In December 1991, appellants filed their initial complaint in the Circuit Court for Baltimore City against NAH and Dr. Fields. Defendants immediately challenged venue. At a March 20, 1992, hearing, Judge Rombro found that both NAH and Dr. Fields were residents of Anne Arundel County, that they both maintained offices and engaged in business solely in Anne Arundel County, and that appellants' cause of action arose in Anne Arundel County. Based on these findings, he ruled that Baltimore City was an improper venue for the suit and transferred the case to Anne Arundel County. On appeal, appellants claim that Judge Rombro erred in this ruling.

---

7. Dr. Buchholz's testimony on this point was as follows:

 Q Now, is there any indication or any evidence that you have, Dr. Buchholz, that had Darwin Green been referred [to the University of Maryland Hospital by North Arundel Hospital on August 18, 1988] the decision-making at [the] University [of Maryland] would have been different?

 A I have no specific evidence to point to. Obviously, it would have been 24 or 25 hours earlier, but I can't point to anything that's documented in the records that indicates that the course would have been different.

Section 6–201 of the Courts and Judicial Proceedings Article of the Maryland Code (1998 Repl.Vol.) (hereinafter "CJ") provides, in pertinent part:

(a) *Civil Actions.*—Subject to the provisions of §§ 6–202 and 6–203 and unless otherwise provided by law, a civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation. . . .

(b) *Multiple Defendants.*—If there is more than one defendant, and there is no single venue applicable to all defendants, under subsection (a), all may be sued in a county in which any one of them could be sued, or in the county where the cause of action arose.

CJ § 6–202 reads, so far as here material:

In addition to the venue provided in § 6–201 or § 6–203, the following actions may be brought in the indicated county:

* * *

(8) Tort action based on negligence—*Where the cause of action arose;*

(Emphasis added.)

All parties agree with Judge Rombro's finding that, at the time the complaint was filed in Baltimore City, both NAH and Dr. Fields were Anne Arundel County residents who maintained their offices and conducted their business solely in that County. As such, neither party disputes that Anne Arundel County was the only proper venue under CJ § 6–201 because it provided "a single venue applicable to all defendants." Nevertheless, appellants note that CJ § 6–202(8) provides an alternative venue in negligence actions, allowing plaintiffs to bring suit in the county where the cause of action arose. *See Wilde v. Swanson,* 314 Md. 80, 92, 548 A.2d 837 (1988) (holding that when multiple venues are proper under both CJ § 6–201 and CJ § 6–202, the plaintiff can choose to proceed under either section—"Neither section enjoys a priority over the other"). Appellants maintain that, under CJ § 6–202(8),

venue was proper in Baltimore City because their cause of action arose there.

Whether the court was right in transferring the case to Anne Arundel County depends, in part, upon the meaning of the phrase "where the cause of action arose." Maryland appellate courts have not had occasion to interpret this phrase in the context of our venue statutes, but prior decisions have interpreted similar language contained in section 11–108(b) of the Courts and Judicial Proceedings Article of the Maryland Code (1998 Repl.Vol.) (hereinafter CJ § 11–108(b)). Section 11–108(b) states:

> *Limitation on amount of damages established.*—(1) In any action for damages for personal injury *in which the cause of action arises* on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

(Emphasis added.)

In *Owens–Illinois, Inc. v. Armstrong,* 326 Md. 107, 604 A.2d 47 (1992), the Court of Appeals held that, with respect to CJ § 11–108(b), a cause of action "arises" when facts exist to support each element of the cause of action. *See id.* at 121, 604 A.2d 47 (citing *Owens–Illinois v. Armstrong,* 87 Md.App. 699, 724–25, 591 A.2d 544 (1991)). The Court explained:

> We agree with the Court of Special Appeals' conclusion that a cause of action in negligence ... arises "when facts exist to support each element." In a negligence claim, the fact of injury would seemingly be the last element to come into existence. The breach, duty, and causation elements naturally precede the fact of injury.

*Id.* (citation omitted); *see Owens Corning v. Bauman,* 125 Md.App. 454, 480, 726 A.2d 745 (1999) ("Each of the elements of a claim must be met before a cause of action arises...."); *Ford Motor Co. v. Wood,* 119 Md.App. 1, 45, 703 A.2d 1315, *cert. denied,* 349 Md. 494, 709 A.2d 139 (1998) ("[A] cause of action for negligence ... arises when the injury first occurs."); *Anchor Packing Co. v. Grimshaw,* 115 Md.App. 134, 153, 692 A.2d 5 (1997), *vacated in part sub nom. Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998) (stating that a

cause of action arises "when all the elements of the claim are satisfied"); *DiLeo v. Nugent,* 88 Md.App. 59, 77, 592 A.2d 1126 (1991) (concluding that a medical malpractice cause of action arises "when a negligent act, coupled with the resulting harm, amounts to a legally cognizable wrong").

■ Although the cases just referenced deal with *when* a "cause of action arises" in the context of CJ § 11–108(b), we see no reason why the same interpretation of the phrase should not be applied to *where* a "cause of action arises" under CJ § 6–202(8). *See Engel v. Gosper,* 71 N.J.Super. 573, 177 A.2d 595, 598 (N.J.Super. Ct. Law Div.1962) (noting that state statute dictating that a wrongful death cause of action arises *when* death occurs also makes it "reasonable to conclude that [a wrongful death] cause of action arises *where* death occurs" (emphasis added)). We therefore hold that, under CJ § 6–202(8), "where the cause of action arises" is the place where all the elements of the negligence claim (duty, breach, causation, and injury) are satisfied. In negligence cases, because injury is the last element to come into existence, a cause of action in negligence arises *where the injury first occurs.*

Appellees argue that a cause of action in contract or tort arises *where the alleged breach occurs.* Appellees cite *Kane v. Schulmeyer,* 349 Md. 424, 708 A.2d 1038 (1998), in support of this position. Other than citing to *Kane,* appellees fail to point to any case that holds that a cause of action arises at the place of the breach. *Kane* does not hold that a cause of action in contract or tort arises where the breach occurs—the specific holding of *Kane* is that, in an action involving the breach of an agreement to pay money, a cause of action for breach of contract arises where payment was to be made; if no place of payment is specified in the agreement, then the cause of action arises where the creditor resides or has its place of business. *See id.* at 438, 708 A.2d 1038.

At issue in *Kane* was the breach of an agreement to repay a debt. In such actions, the breach and damages arising from the breach will always occur in the same place. In other words, as soon as the debtor fails to make payment at the

proper place, the creditor has incurred damages at that location. The *Kane* Court did not address the issue of where a cause of action arises when the breach occurs in one county and the injury occurs in another. As such, *Kane* does not support appellees' argument that a cause of action arises where the breach occurs.[8]

---

8. Our research has revealed that the majority of our sister states with venue statutes similar to ours have held that a tort cause of action arises at the place of injury. *See, e.g., Ebell v. Seapac Fisheries, Inc.,* 692 P.2d 956, 957–58 (Alaska 1984) (interpreting statute that placed venue in "the judicial district in which the claim arose" and holding that, in tort cases, this language placed venue where the plaintiff first suffered injury); *Tucker v. Fianson,* 484 So.2d 1370, 1371–72 (Fla.Dist. Ct.App.1986) (construing venue statute allowing suit to be brought "where the cause of action accrued" and holding that, in negligence suits, "the rule is well established that a cause of action accrues where the plaintiff suffers his or her injuries ..."); *Gaboury v. Flagler Hosp., Inc.,* 316 So.2d 642, 644 (Fla.Dist.Ct.App.1975) ("[A] cause of action is said to arise at the place where the act creating the right to bring an action occurred, and when a tort is complete in a particular county, the cause of action is deemed to have accrued there so as to fix venue ...." (emphasis omitted)); *Wentz v. Montana Power Co.,* 280 Mont. 14, 928 P.2d 237 (1996) (holding that venue statute permitting tort suit in "the county where the tort was committed" allowed wrongful death cause of action to be brought only in county where death occurred; rejecting position that a tort is "committed" or "arises" where the negligent acts took place); *Engel v. Gosper,* 71 N.J.Super. 573, 177 A.2d 595, 597–98 (N.J.Super. Ct. Law Div.1962) ("It is conceded by all counsel and seems well established that a cause of action for damages for personal injuries caused by negligent acts arises where the injuries are inflicted"; rejecting position that a wrongful death cause of action arises at the place where the allegedly wrongful acts occurred); *Emert v. Larami Corp.,* 414 Pa. 396, 200 A.2d 901, 902–04 (1964) ("To constitute a tort, there must be an injury; mere negligence establishes no right of action. The place of wrong is, and the tort must be deemed to arise, where the injury is inflicted, not where the negligent acts leading to it were committed.") (emphasis omitted); *Action Indus. v. Wiedeman,* 236 Pa.Super. 447, 346 A.2d 798, 805 (1975) (construing statute placing venue in "the county in which the cause of action arose" and holding that, "[i]n a tort action, the cause of action arises where the injury is inflicted"). *But see, e.g., Ivey v. Padgett,* 502 So.2d 22, 23 (Fla.Dist.Ct. App.1986) ("In a tort action, the cause of action accrues where the act (or omission) creating the right to bring the action occurred."); *Spencer v. Flathead County,* 212 Mont. 399, 687 P.2d 1390, 1392 (1984) ("Where a cause of action arises is to be determined by inquiring where the act or breach occurs which creates the necessity for bringing the suit."); *McGuire v. Fitzsimmons,* 197 W.Va. 132, 475 S.E.2d 132, 136– 37 (W.Va.1996) (noting that prior decisions have recognized that venue

may arise in more than one county and holding that a legal malpractice cause of action arises either (1) where the attorney's duty came into existence; (2) where the breach of the duty occurs; or (3) where the damages from the breach occurs). *See generally* Jay M. Zitter, Annotation, *Place Where Claim or Cause of Action "Arose" Under State Venue Statute,* 53 A.L.R.4th 1104 (1987).

On the other hand, federal courts have taken a variety of different approaches in determining where a cause of action "arises" under the federal venue statute (28 U.S.C. § 1391). *See generally,* Annotation, *What Is the Judicial District "In Which the Claim Arose" for Venue Purposes Under 28 U.S.C.S. § 1391(a) and (b),* 59 A.L.R. Fed. 320 (1982). Prior to 1990, title 28, section 1391(a), of the United States Code placed venue in diversity cases in the federal district "in which the claim arose." Some federal courts, like most state courts, interpreted this language as permitting venue only in the jurisdiction where the plaintiff first suffered injury ("place of injury" test). *See, e.g., Delta Educ., Inc. v. Langlois,* 719 F.Supp. 42, 49 (D.N.H.1989); *Wade v. Olympus Indus.,* 695 F.Supp. 730, 734 (S.D.N.Y.1988); *Quinn v. Bowmar Pub. Co.,* 445 F.Supp. 780 (D.Md.1978). Most federal courts, however, adopted one of two tests to determine where a claim arose—the "weight of contacts" test or the "substantial part" test. *See Missouri Hous. Dev. Comm'n v. Brice,* 919 F.2d 1306, 1309 (8th Cir.1990); *Frontier Fed. Sav. & Loan Ass'n v. National Hotel Corp.,* 675 F.Supp. 1293, 1300 (D.Utah 1987); *Hodson v. A.H. Robins Co.,* 528 F.Supp. 809, 813 (E.D.Va.1981), *aff'd,* 715 F.2d 142 (4 th Cir.1983).

Under the "weight of contacts" test, venue is proper in the district that has the most significant ties to the claim, and not proper in a district where merely insignificant conduct took place. *See Brice,* 919 F.2d at 1312; *Broadcasting Co. v. Flair Broadcasting Corp.,* 892 F.2d 372, (4th Cir.1989); *Frontier,* 675 F.Supp. at 1301; *Hodson,* 528 F.Supp. at 813; *Quinn v. Bowmar Pub. Co.,* 445 F.Supp. 780, 783 (D.Md.1978); *Hindu Incense v. Meadows,* 439 F.Supp. 844, 847 (N.D.Ill.1977); *California Clippers, Inc. v. United States Soccer Football Ass'n,* 314 F.Supp. 1057, 1063 (N.D.Cal.1970); *Philadelphia Hous. Auth. v. American Radiator & Standard Sanitary Corp.,* 291 F.Supp. 252, 260 (E.D.Pa.1968). It is noteworthy, however, that federal courts applying the "weight of contacts" test have given significant weight to the location of the injury in analyzing where a claim arose. *See Hodson,* 528 F.Supp. at 814; *Grappone, Inc. v. Subaru of America, Inc.,* 403 F.Supp. 123, 133 (D.N.H.1975) (adopting the "weight of contacts test" but noting that "the place of injury should be given great weight and consideration by the court"). Other federal courts have used the "weight of contacts" test only in complex cases where injuries are present in multiple districts; for simple tort cases, these courts have stated that the "place of injury" test applies. *See California Clippers,* 314 F.Supp. at 1063; *Philadelphia Hous. Auth.,* 291 F.Supp. at 260 ("While it may be well to find that a tort claim arises in the jurisdiction where injury occurs, antitrust actions are not susceptible to such simplistic rationale.") (emphasis omitted).

The "substantial part" test places venue in the district in which a substantial part of the events or omissions giving rise to the claim occurred. *See, e.g., Lamont v. Haig,* 590 F.2d 1124, 1134–35 (D.C.Cir.

We therefore reject appellees' interpretation of the language in CJ § 6–202(8) and hold that a cause of action in negligence arises where the injury first occurs.

## B. *Where Did Darwin First Suffer Injury?*

Appellants presently contend that because Darwin suffered his cardiac arrest and brain damage at the University of Maryland Hospital in Baltimore City, the cause of action arose in Baltimore City because this is where he manifested injury proximately caused by NAH's and Dr. Fields' alleged breach of the standard of care. On the other hand, appellees maintain that, after his discharge from NAH on August 18, 1988, and due to his undiagnosed shunt malfunction, Darwin incurred pain and suffering injuries in Anne Arundel County,

---

1978); *Commercial Lighting Prods., Inc. v. U.S. Dist. Court*, 537 F.2d 1078, 1080 (9th Cir.1976); *Medical Emergency Serv. Assocs. v. Duplis*, 558 F.Supp. 1312 (N.D.Ill.1983); *Hodson*, 528 F.Supp. at 815; *Thornwell v. United States*, 471 F.Supp. 344, 355–56 (D.D.C.1979).

In *Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), the Supreme Court had the opportunity to interpret section 1391, but the Court did not expressly endorse any particular test for determining where a claim arises. The Court determined where a claim arose by balancing the various relevant contacts between the claim and the districts. *See id.* at 186, 99 S.Ct. 2710. Lower courts interpreting *Leroy* concluded that the Supreme Court's analysis implicitly rejected the "place of injury" test and indirectly endorsed the "weight of contacts" approach. *See Missouri Hous. Dev. Comm'n*, 919 F.2d at 1311; *Broadcasting Co.*, 892 F.2d at 372; *Dody v. Brown*, 659 F.Supp. 541, 550 (W.D.Mo.1987) ("*Leroy* did not overrule those cases applying the weight of the contacts test.").

The confusion among the federal courts ended in 1990 when Congress adopted the "substantial part" test by replacing the "claim arose" language in section 1391 with "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. . . ." 28 U.S.C. § 1391(a)(2) & (b)(2) (1994 & Supp.1997).

Even though many federal cases have determined that a claim "arises" in a district other than the place of injury, appellees make no argument that we should adopt a "weight of contacts" or "significant part" approach. In addition, we note that the Court of Appeals in *Kane* expressly rejected these approaches to venue. The *Kane* Court noted that there were a "bewildering variety of tests to ascertain where claim arose" under the federal venue statute and that there was no need for Maryland courts "to wander into that thicket." 349 Md. at 438–39 n. 6, 708 A.2d 1038.

before he was transported to Baltimore City, and therefore the cause of action arose in Anne Arundel County.

In *Edmonds v. Cytology Services,* 111 Md.App. 233, 681 A.2d 546 (1996), *aff'd sub nom., Rivera v. Edmonds,* 347 Md. 208, 699 A.2d 1194 (1997), we said:

> A patient sustains an "injury" ... when, as a result of the tort, he or she first sustains compensable damages that can be proven with reasonable certainty. Therefore, the patient could suffer an "injury" as a result of a negligent misdiagnosis, when (1) he or she experiences pain or other manifestation of an injury; (2) the disease advances beyond the point where it was at the time of the misdiagnosis and to a point where (a) it can no longer effectively be treated, (b) it cannot be treated as well or as completely as it could have been at the time of the misdiagnosis, or (c) the treatment would entail expense or detrimental side effects that would not likely have occurred had treatment commenced at the earlier time; or (3) the patient dies. This is not, of course, an exhaustive checklist; the overriding inquiry in all cases must be when the patient first sustained legally compensable damages. In any event, the injury occurs, as we have observed, when legally compensable tort damages *first* occur, regardless of whether those damages are discoverable or undiscoverable.

*Id.* at 270, 681 A.2d 546 (citations omitted). Given this definition of injury, we agree with appellees that Darwin first suffered injury in Anne Arundel County.

During discovery, one of the interrogatories propounded to appellants was:

> Describe in detail the injuries, disabilities, and infirmities which you claim that [Darwin] sustained as a result of the occurrence which is the subject matter of this suit, and when each such injury, disability, or infirmity occurred.

Appellants' answer to this interrogatory was:

> At the time [Darwin] was in the care of the Defendants *at North Arundel Hospital,* the child's *intracranial pressure was constantly increasing causing neurological deteriora-*

*tion* moving him inevitably toward and ultimately causing massive brain injuries. . . .

(Emphasis added.) This interrogatory answer shows that appellants claimed that the defendants caused Darwin to suffer injury in the form of "neurological deterioration" and increased intracranial pressure while at NAH, located in Anne Arundel County.

In addition, at trial, appellants' medical expert, Dr. Buchholz, testified that if the doctors at NAH had properly diagnosed Darwin as having a shunt malfunction on August 18, 1988, then he would have been referred to the University of Maryland Hospital twenty-four to twenty-five hours earlier for a shunt revision. *See supra* note 7. Instead, because of this alleged misdiagnosis, Darwin was sent to his home in Anne Arundel County. While at his home, Darwin experienced pain and suffering in the form of headaches and drowsiness caused by his increasing intracranial pressure. The next day, at Dr. Lee's office in Anne Arundel County, Darwin continued to complain of a headache and drowsiness, and Dr. Lee also noted that Darwin had a "staggering gait"—a common symptom of increased intracranial pressure. Overall, Darwin's condition continued to worsen after his release from NAH, and this worsening took place in Anne Arundel County. In short, Darwin experienced pain and suffering injury in Anne Arundel County due to appellees' alleged negligent failure to diagnose the blocked shunt. Darwin's pain and suffering could have been limited if he had been referred immediately to the University of Maryland Hospital for a shunt revision. In this regard, Dr. Buchholz testified on cross-examination as follows:

Q Okay. Now, in response to . . . whether Darwin Green had sustained injury between the time he was seen at North Arundel Hospital and the time of his [cardiac] arrest, some time around midday on the 20th, you had mentioned . . . that [Darwin] had sustained no irreversible injury. But, in fact, you're willing to go further than that and say that he sustained no injury whatsoever; is that true?

A I mean, *if you mean symptoms as being some form of injury, he had some symptoms which had increased.* But I think in the sense that we really mean the term some sort of permanent damage, that is true that he had not sustained permanent damage prior to the arrest.

(Emphasis added.)

■ In sum, because appellants' own evidence showed that Darwin *first* experienced injury in the form of "neurological deterioration" and pain and suffering in Anne Arundel County, the cause of action arose in that county. Accordingly, Judge Rombro did not err in transferring the case out of Baltimore City.[9] The fact that Darwin experienced more serious injuries later in Baltimore City is of no consequence for venue purposes—the cause of action was complete as soon as Darwin first experienced *any* injury from the alleged negligent acts of NAH and Dr. Fields.

### *Issue 2*

Both sides agree that Dr. Mody carries on his business and maintains an office in Baltimore City. Appellants' second claim is that Judge Rushworth erred in failing to transfer the case back to the Circuit Court for Baltimore City once Dr. Mody was added to the action. Appellants argue that the addition of Dr. Mody to the case made venue proper in Baltimore City under the multiple defendant provision of CJ § 6–201(b).

■ Appellants' argument is without merit because, at the time that Judge Rushworth denied appellants' motion to transfer the case back to Baltimore City, Dr. Mody had not been named as a defendant in the case. The court denied appellants' motion to transfer on August 2, 1996. Appellants did

---

9. The interrogatory and its answer, and the testimony showing that Darwin first experienced injury in Anne Arundel County, were elicited after the Circuit Court for Baltimore City made its venue ruling. Nevertheless, it would be an exercise in futility to remand this case to determine where Darwin first experienced injury when appellants' own evidence shows that Darwin incurred pain and suffering injuries in Anne Arundel County.

not amend their complaint to add Dr. Mody to this case until August 9, 1996. Thereafter, appellants never renewed their motion to transfer. Because Dr. Mody was not a defendant in the case at the time Judge Rushworth decided the motion, there was no basis for him to grant the transfer. As such, there was no error.

### Issue 3

Appellants next contend that the trial court erred as a matter of law in excluding Darwin from the courtroom during the liability phase of the trial because such exclusion was: (A) a violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213 (1994) (hereinafter "ADA"); (B) a violation of federal and state due process; and (C) a violation of the First and Fourteenth Amendments' implicit right guaranteeing the public access to trials.

### A. *Americans With Disability Act*

Title II of the ADA, 42 U.S.C. §§ 12131–12165 (1994), deals with discrimination against disabled persons by public entities.[10] Section 12132 states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Federal regulations implementing the requirements of the ADA state:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability,

---

**10.** Under the ADA's definition, state courts are public entities. *See* 42 U.S.C. § 12131(1)(B) (1994); *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir.1998); *Galloway v. Superior Court*, 816 F.Supp. 12, 19 (D.D.C. 1993); *State v. P.E.*, 284 N.J.Super. 309, 664 A.2d 1301, 1304 (N.J.Super. Ct. Law Div.1994); *People v. Caldwell*, 159 Misc.2d 190, 603 N.Y.S.2d 713, 714 (N.Y.Crim.Ct.1993).

unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7) (1999); *see Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 979 (9th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 423, 139 L.Ed.2d 324 (1997).

Once a qualified individual with a disability[11] requests a reasonable modification, and the public entity denies the request, Title II sets forth various procedural mechanisms[12] by which that individual can seek injunctive relief to force the public entity to make the reasonable modifications to allow the disabled individual access to the services, programs, or activities of the public entity.[13] In short, the ADA allows for action only *against the public entity for prospective injunctive relief*—there is nothing in the ADA that provides a basis for reversing the judgment of a lower court in a civil dispute between private parties. Therefore, assuming, *arguendo*, that Judge Rushworth's ruling constituted a violation of the ADA, this would only give Darwin a separate cause of

---

11. A "qualified individual with a disability" is defined as:
 [A]n individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.
 42 U.S.C. § 12131(2) (1994).

12. Plaintiffs alleging a violation of the ADA by a public entity can: (1) complain under the public entity's internal grievance procedure, if available; (2) file an administrative complaint with a designated federal agency or the United States Department of Justice within 180 days of the date that the alleged discrimination occurred; or (3) file suit in court for injunctive relief. *See* 42 U.S.C. § 12133 (1994); 28 C.F.R. §§ 35.107(b), 35.170–35.175 (1998).

13. Attorney's fees and court costs are also recoverable, but monetary damages are not permitted for a violation of Title II of the ADA. *See* 28 C.F.R. § 35.175 (1998); *Tyler v. City of Manhattan*, 857 F.Supp. 800, 819 (D.Kan.1994); *Coleman v. Zatechka*, 824 F.Supp. 1360, 1374 n. 30 (D.Neb.1993).

action for injunctive relief against the trial judge in his official capacity as a judicial officer of the State [14]—it would not constitute reversible error in the case *sub judice*. Thus, whether Judge Rushworth's exclusion of Darwin from trial violates the ADA is irrelevant to the outcome of this case.

## B. *Due Process*

Appellants also argue that the exclusion of Darwin from the liability phase of the trial violated his due process rights under the United States and Maryland Constitutions. For reasons set forth below, we disagree.

A party does not have an absolute right to attend trial. *See Helminski v. Ayerst Lab.*, 766 F.2d 208 (6th Cir.1985); *Marks v. Mobil Oil Corp.*, 562 F.Supp. 759, 768 (E.D.Pa.1983), *aff'd*, 727 F.2d 1100 (3 rd Cir.1984); *Cary v. Oneok, Inc.*, 940 P.2d 201, 204 (Okla.1997). Although there is no Maryland case law specifying the circumstances under which the exclusion of a party from trial offends due process, many courts faced with this issue have adopted the reasoning used by the Sixth Circuit Court of Appeals in *Helminski*. *See, e.g., Hines v. Wilkinson*, 163 F.R.D. 262, 265–68 (S.D.Ohio 1995); *Province v. Center for Women's Health & Family Birth*, 20 Cal.App.4th 1673, 25 Cal.Rptr.2d 667, 675 (1993) (noting that *Helminski* "surveyed, considered, and discussed the rules which had been applied to a broad range of cases" dealing with the exclusion of parties from trial); *Cary*, 940 P.2d at 205; *Bremner v. Charles*, 312 Or. 274, 821 P.2d 1080, 1085 (1991), *modified by*, 313 Or. 339, 832 P.2d 454 (1992).

In *Helminski*, the plaintiffs alleged that the minor plaintiff's mother's exposure during pregnancy to a surgical anesthetic

---

**14.** So far, no court has considered the issue of whether the exclusion of a disabled plaintiff from a civil trial violates the ADA. *See Cary v. Oneok, Inc.*, 940 P.2d 201, 205 n. 6 (Okla.1997); Matthew A. Sokol, *Cary v. Oneok, Inc.: Oklahoma Supreme Court Upholds Plaintiff's Right to Attend Trial*, 19 Pace L.Rev. 195, 214 (1998) ("The issue of whether the [ADA] gives rise to a cognizable cause of action for a plaintiff who is excluded from trial is yet to be litigated."). We express no opinion as to the merits of such an action under the facts of this case.

manufactured by the defendant caused injury to the minor's nervous system when he was a fetus. *See* 766 F.2d at 210. The defendants moved to exclude the minor from trial, arguing that his appearance before the jury would be prejudicial to their case. *See id.* at 213. At the time of trial, the minor required twenty-four hour a day care, did not speak, was not toilet trained, and had an extremely low IQ. *See id.* at 210. The trial judge bifurcated the proceedings and excluded the minor from the liability phase of the trial. *See id.* at 211. On appeal to the Sixth Circuit, the plaintiffs argued, *inter alia,* that the exclusion of the minor deprived him of his Fifth Amendment right to due process. *See id.* at 213.

The *Helminski* court held that, although a plaintiff does not have an absolute right to be present in the courtroom, due process prevents a court from arbitrarily excluding a party from trial. *See id.* According to the court, in cases where the plaintiff has a severe injury that may potentially prejudice the jury and the plaintiff is unable to comprehend the proceedings or aid counsel, exclusion of the plaintiff does not offend due process. *See id.* at 217. The court stated:

> Although under some circumstances the mere sight by a jury of a severely injured plaintiff may evoke juror sympathy, juror sympathy alone is insufficient to establish juror prejudice. Generally, the jury will follow the court's instructions and fulfill its promise to decide the case solely on the facts. On the other hand, there may be occasions when the mere presence of a party would render the jury unable to arrive at an unbiased judgment concerning liability. Should such a case arise and the presence of the party would not aid the fair administration of justice, the trial court can exclude the plaintiff or limit his presence. A party's involuntary exclusion under these circumstances would not constitute a denial of due process. Nevertheless, absent disruptive behavior, involuntary exclusion of a party who is able to comprehend the proceedings and aid counsel would constitute a denial of due process since exclusion of such party would deny him the right to obtain a fair trial.

*Id.; see also Morley v. Superior Court*, 131 Ariz. 85, 638 P.2d 1331, 1334 (1981) (holding that plaintiff, who was comatose, required a tracheostomy to breathe, was fed via a feeding tube, and was unable to communicate with his lawyers, was properly excluded from liability phase of trial because his presence would prejudice the jury); *Dickson v. Bober*, 269 Minn. 334, 130 N.W.2d 526, 530 (1964) (holding that because plaintiff was unable to testify or comprehend the proceedings, he possessed no absolute right to be present at trial so long as his rights were protected by his attorney and guardian who brought the action on his behalf).

The *Helminski* court set forth a two-step inquiry to determine whether a party's exclusion from trial comports with due process.

> [T]he defendant who seeks to exclude a handicapped plaintiff must establish at a hearing that the plaintiff's presence would prevent or substantially impair the jury's performance of its factfinding task. The requisite showing of prejudice cannot be satisfied simply by establishing that a plaintiff has a physical or mental injury; the party seeking the exclusion must establish that the party's appearance or conduct is likely to prevent the jury from performing its duty....

> Should the [trial] court determine that the party's mere presence would be prejudicial, the court must next consider whether the party can understand the proceedings and aid counsel. If the trial court concludes that the party can comprehend the proceedings and assist counsel in a meaningful way, the party cannot be involuntarily excluded regardless of prejudicial impact; in such a case, cautionary instructions will protect the interests of the defendant in a fair trial.

*Id.* at 218. The court then stated that if a trial court concludes that the plaintiff's presence would substantially prejudice the jury and the plaintiff would be unable to assist counsel or comprehend the proceedings, then the trial judge should bifurcate the case into separate trials on liability and damages, and exclude the plaintiff from the liability phase.

*See id.* at 217. The court noted, however, that the exclusion of a party from the damages portion of the proceedings would never be appropriate. *See id.* Applying this analysis to the facts of *Helminski,* the Sixth Circuit found error because the trial judge never observed the minor plaintiff to determine whether his appearance would prejudice the proceedings. *See id.* at 218. Nevertheless, the *Helminski* court concluded that this error was harmless and affirmed the trial judge's decision. *See id.*

Applying the *Helminski* analysis to the case at bar, we find no constitutional violation in Darwin's exclusion from the liability portion of the trial. Prior to the start of trial, Judge Rushworth held a hearing on the defendants' motion to exclude. Judge Rushworth stated that he had read the *Helminski* case, had the opportunity to watch a "day in the life" video [15] film that showed Darwin being tended to by his nurses, and had considered Darwin's medical records. Judge Rushworth then stated on the record:

> Let me address that video which goes on at length showing the Plaintiff virtually motionless except for some eye blinking and except for periods of time when instruments were inserted by way of the feeding tube and the suctioning from the neck or throat area which the court understands by the records is done periodically, perhaps as often as every two hours. At that point, there is some jerking movement that lifts his legs and the extension of his arms above and about the bed he lies in.

> \* \* \*

> . . . . Unlike the judge in *Helminski,* this Court then has an opportunity short of actually visiting with the [p]laintiff

---

**15.** A trial judge's viewing of a video prepared by the plaintiffs showing a "day in the life" of the disabled plaintiff in lieu of actually observing the plaintiff in person has been held to allow sufficient fact-finding by the trial judge in order to decide whether the plaintiff's presence at the liability phase of the trial would be prejudicial. *See Reems v. St. Joseph's Hosp. and Health Ctr.,* 536 N.W.2d 666, 670 (N.D.1995).

and the time in light of the fact that we are going to try this case in the morning precludes that visit.

But short of that, the [c]ourt feels confident to do some fact finding. And those facts are that and this particular [p]laintiff does not have the ability to communicate in any fashion with counsel or his parents or the nurses in this video. And the [c]ourt is convinced that he will not be able to aid his counsel in prosecuting the case and offering any sort of input beyond that.

.... The [c]ourt finds then that he is reduced to the vegetable state. That there can be no purpose in presenting the [p]laintiff short of prejudice to the [d]efendant's case.

.... In this instance, there can be no input to the [p]laintiff's counsel. The Court cannot arbitrarily deny a party's right to be present during trial because of the party's appearance, but the possibility of prejudice is to be weighed.

And in this instance, the [c]ourt finds that it is great beyond the extension of any instructions that could be offered and will be offered in all likelihood in any case as to sympathy or prejudice public opinion. In this instance, the [c]ourt finds that ... to grant a fair trial which would go to all parties would require excluding the [p]laintiff. ...

\* \* \*

The burden of persuasion is on the moving party and they have carried that burden in this instance. The [d]efendant who seeks to exclude a handicapped plaintiff must establish that the presence of the plaintiff would prevent and substantially impair the jury's performance. The impairment or the prejudice must be so great that the jury instructions will not likely correct that prejudice.

And having viewed the tape, the [c]ourt is convinced that any viewing of the [p]laintiff in person or by video would leave any party in a position to be emotionally struck and otherwise feeling sympathy for the [p]laintiff. This trial is

also a matter which is bifurcated. We addressed the matter of liability. And so, therefore, the [c]ourt sees no necessity as it would if and when we are at the state of the position of the trial addressing damages to have the [p]laintiff present.

Obviously, if the case were not bifurcated, or at least, I think, the [c]ourt would have a different slant on the particular circumstances which at some point it will certainly be necessary going beyond liability to address damages and then, of course, to have the [p]laintiff presented if th[ose] are the wishes of the prosecutors of the claim.

The above-quoted findings show that Judge Rushworth went to great lengths to ensure that Darwin's constitutional rights were not violated by arbitrarily excluding him from trial.

### C. *Public Access to Trial*

 Appellants' final argument against Darwin's exclusion is based on the right of the public to attend trials. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (holding that the right to attend trials is implicit in the guarantees of the First Amendment). Appellants argue that "[i]f Darwin Green were not a party to this action, and were merely an observer, he would have had every right to public access to the court proceedings under [the law]. It follows that Darwin Green had every right to be present in court as a party to this action...." We disagree with appellants' premise. Just as the right of a party to attend trial is not without limitation, the right of the public to attend a trial as an observer is also not absolute. The Supreme Court in *Richmond Newspapers* noted this very fact in its opinion:

We have no occasion here to define the circumstances in which all or parts of a ... trial may be closed to the public, but our holding today does not mean that the First Amendment rights of the public and representatives of the press are absolute. Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, so may a trial judge, in the interest of the fair

administration of justice, impose reasonable limitations on access to a trial.

*Id.* at 581 n. 18, 100 S.Ct. 2814 (citations omitted). Thus, it is clear that Darwin did not have an absolute right to attend the trial as an observer—the trial judge had discretion to exclude anyone from the courtroom "in the interest of the fair administration of justice." *Id.* Given the fact that Judge Rushworth already concluded that Darwin's presence would prejudice the proceedings, there was no abuse of discretion in barring Darwin from the courtroom.

D. *Other Matters*

■ What we have said thus far concerning Darwin's exclusion from the courtroom is dicta. Even if we were to have decided that Darwin should not have been excluded from the courtroom, appellants have failed to show that the error was prejudicial. *See Bradley v. Hazard Tech. Co.,* 340 Md. 202, 206, 665 A.2d 1050 (1995) ("Unless an appellant can demonstrate that a *prejudicial* error occurred below, reversal is not warranted." (emphasis added)).

As noted previously, the trial court granted a motion for judgment in favor of NAH and Dr. Mody at the conclusion of the plaintiffs' case. The propriety of the grant of judgment was not challenged in this appeal. Whether Darwin had been in the courtroom during the entire trial up to the point where the motions were granted could not possibly have helped appellants prove their case against NAH or Dr. Mody.

With respect to Drs. Fields and Axelbaum, the jury answered "no" to the special verdict form question, "do you find the plaintiff has proven that [either Dr. Fields or Dr. Axelbaum] departed from accepted standards of care in the treatment of Darwin Green?" If Darwin had been present during every minute of the trial, his presence could not have affected the answer to that standard of care question.

Appellants argue:

Darwin Green must demonstrate his condition in order to illustrate an element of the applicable standard of care

involved in this specific case. The standard of care for the proper treatment of a patient is not cut and dry but rather is necessarily fluid depending upon differing circumstances. One vital element in determining the standard of care in a given circumstance is clearly the foreseeable consequences of committing an error. A case in which it is known to the physician that a mistake has a very high likelihood of devastating injury to the patient must obviously be handled with the utmost care. The risk to the patient, at least in part, dictates the required caution to be exercised by the physician. A splinter must be removed more carefully from a brain than from a finger. What informs this exercise of care if the physician's awareness of foreseeable possible consequences of error.

This is pure sophistry. The jury was well aware of Darwin's vegetative state. During Dr. Buchholz's direct examination, the following colloquy occurred:

Q [PLAINTIFF'S COUNSEL] Now, what happened ... to Darwin as a result of the cardiac arrest?

A As a result of the cardiac arrest, he suffered ... decreased oxygen ... and blood supply to the brain. He suffered brain damage from those two things in the course of his arrest, and *he is now in a chronic vegetative state.*

(Emphasis added.) Furthermore, during closing argument, plaintiff's counsel stated: "I don't think there was any dispute that Darwin was injured and that he is currently in a persistent vegetative state." Finally, voluminous medical records from Darwin's stay at the University of Maryland Hospital were introduced into evidence. These records clearly set forth Darwin's post-cardiac arrest condition. Accordingly, appellants have failed to demonstrate prejudice resulting from the "error" of excluding Darwin from the courtroom.

### Issue 4

Appellants' final assertion is that the trial judge erred by allowing appellees to present a theory of their case that was against Maryland case law as set forth in *Mehlman v. Powell,*

281 Md. 269, 378 A.2d 1121 (1977). In *Mehlman*, the Court of Appeals held that an emergency room physician's misdiagnosis of a patient's condition was still a proximate cause of the patient's death, despite the fact that it may have been accompanied by the subsequent negligence of other physicians. *See id.* at 275–76, 378 A.2d 1121. Appellants take issue with a number of statements made by defense counsel during opening and closing statements that they believe gave the jury the impression that if the jury found that doctors at the University of Maryland Hospital were negligent or caused Darwin's injuries, then the jury could not conclude that either Dr. Fields's or Dr. Axelbaum's actions were the proximate cause of Darwin's injuries.

This issue has not been preserved for appellate review. None of the statements that appellants point to in the brief were objected to at trial. As such, this claim is waived. *See Grier v. State,* 116 Md.App. 534, 544–45, 698 A.2d 1133 (1997), *rev'd on other grounds,* 351 Md. 241, 718 A.2d 211 (1998) (objections to improper argument of counsel must be made either contemporaneously or before jurors are excused from courtroom to preserve issue for appellate review).

It is true that appellants did make a motion in limine prior to trial to exclude any discussion before the jury of the negligence of the University of Maryland Hospital. Nevertheless, a motion in limine is not the equivalent of a continuing objection—when a party makes a motion in limine to prevent counsel from making an argument and the motion is denied, the party who made the motion must object at the time the argument is made to the jury in order to preserve the objection for appellate review. *See Reed v. State,* 353 Md. 628, 643, 728 A.2d 195 (1999) (when a motion in limine is denied, a contemporaneous objection to evidence must be made when the evidence is admitted at trial to preserve the issue for appellate review); *United States Gypsum Co. v. Mayor & City Council,* 336 Md. 145, 174, 647 A.2d 405 (1994); *Prout v. State,* 311 Md. 348, 356, 535 A.2d 445 (1988); *Collier v. Eagle–*

*Picher Indus.,* 86 Md.App. 38, 62, 585 A.2d 256 (1991); *Beghtol v. Michael,* 80 Md.App. 387, 394, 564 A.2d 82 (1989).

■ Furthermore, even if we assume that appellees' counsel did make improper causation arguments, the "error" in allowing such arguments was rendered moot by the jury's verdict. The jury never even got to the issue of causation because they concluded that the plaintiffs had failed to prove that either Drs. Fields or Axelbaum departed from the appropriate standard of care in their treatment of Darwin.

■ Finally, appellants present us with a hodgepodge of tangential arguments in the closing pages of their brief involving a host of evidentiary rulings and jury instructions. Confusingly, all of these arguments appear in the section of their brief where appellants seek to answer Issue 4 ("Did the trial court err in allowing [a]ppellees to present a theory of their case that is against Maryland case law as stated in Mehlman v. Powell?"). None of these last referred to arguments concern the proximate cause issue considered in *Mehlman.* We therefore decline to address any of these issues because they were not set forth in the "Questions Presented" section of appellants' brief.[16] *See* Md. Rule 8-504(a)(3) (A brief shall contain "[a] statement of the questions presented, separately numbered, indicating the legal propositions involved and the questions of fact at issue expressed in the terms and circumstances of the case without unnecessary detail.") Appellants can waive issues for appellate review by failing to mention them in their "Questions Presented" section of their brief. Confining litigants to the issues set forth in the "Questions Presented" segment of their brief ensures that the issues presented are obvious to all parties and the Court. *See DiPino v. Davis,* 354 Md. 18, 56, 729 A.2d 354 (1999).

---

16. Even if these issues had been properly raised on appeal, we would find that they had no merit for the reasons set forth in the brief filed by Drs. Fields and Axelbaum.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.