986 A.2d 427

**Earlene BURNSIDE, et. ux.**

v.

**Randall V. WONG, et al.**

No. 4, Sept. Term, 2009.

Court of Appeals of Maryland.

Jan. 7, 2010.

Matthew P. Maloney (Maloney Law Office, Kensington, MD), on brief, for Petitioners.

Brief of Amicus Maryland Ass'n for Justice on behalf of Petitioners: James K. MacAlister, Esquire Saiontz & Kirk, Baltimore, MD.

Anthony J. Breschi (Neal M. Brown of Waranch & Brown, LLC, Lutherville, MD; Agnus Everton of Morgan, Carlo, Downs & Everton, P.A., Hunt Valley, MD), on brief, for Respondents.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

We are asked to consider whether venue in a medical malpractice action, coupled with a lack of informed consent complaint, will lie in the Baltimore City Circuit Court, where it was filed, when the complainant lives in Baltimore City, but the alleged misdiagnosis, negligent medical treatment, and failure to obtain informed consent, allegedly related to a degenerative eye condition, known as proliferative diabetic retinopathy,[1] took place solely in Baltimore County, and the physician neither lives nor practices medicine in Baltimore City.

After the Respondent, Dr. Randall Wong, filed a Motion to Dismiss for Improper Venue on the basis of Sections 6–201(a)[2] and 6–202(8)[3] of the Courts and Judicial Proceedings Article,

---

1. According to the affidavit of Dr. David Newsome, filed in the trial court by the Petitioner, proliferative diabetic retinopathy can progress from background diabetic retinopathy. Retinopathy has been defined as a "[d]isease or disorder of the retina. The term is usually used to describe damage to the retina caused by persistent *hypertension* (high blood pressure) or *diabetes mellitus.*" *The American Medical Association Encyclopedia of Medicine* 868 (Charles B. Clayman ed., Random House 1989) (emphasis in original).

2. Section 6–201(a) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2002 Repl.Vol.) states in pertinent part:
 (a) *Civil actions.*—Subject to the provisions of §§ 6–202 and 6–203 and unless otherwise provided by law, a civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation.

3. Section 6–202(8) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2002 Repl.Vol.) states:
 (8) Tort action based on negligence—Where the cause of action arose;

Maryland Code (1974, 2002 Repl.Vol.),[4] Judge Michel Pierson transferred the case to Baltimore County, reasoning that at the time the lawsuit was filed, Dr. Wong neither resided nor carried on a regular business in Baltimore City. In a Motion to Reconsider, Alter, Amend or Revise the ruling, Mrs. Burnside, for the first time, asserted that under Section 6–202(8), venue was proper in Baltimore City, where she resided, because her "first eye injury while under Dr. Wong's care" occurred there. Judge Pierson denied the Motion, and Mrs. Burnside appealed to the Court of Special Appeals, which affirmed, holding that the alleged misdiagnosis and failure to obtain informed consent, whereby Mrs. Burnside's diabetic retinopathy was allowed to progressively worsen, constituted an injury such that the "cause of action arose" in Baltimore County. Mrs. Burnside petitioned this Court for certiorari, which we granted, *Burnside v. Wong*, 407 Md. 275, 964 A.2d 675 (2009), to address three questions, which we have renumbered:

I. Does a plaintiff's medical injury occur in the county where, and at the time that, a plaintiff suffers harm resulting from the negligent act of the defendant for the imposition of venue in that county, pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6–202(8)?

II. May a defendant's contacts with a Maryland county at the time of his alleged negligence be considered in a trial court's venue analysis, pursuant to MD.CODE ANN., CTS. & JUD. PROC. § 6–201(a)?

III. Are a defendant physician's active medical privileges and academic appointments at various hospitals and medical schools located within a Maryland county sufficient contact with that jurisdiction to subject the defendant to venue in that county, pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6–201(a)?

---

**4.** Statutory references to Section 6–201(a) and 6–202(8) throughout are to the Courts and Judicial Proceedings Article, Maryland Code (1974, 2002 Repl.Vol.). All references are to the 2002 Replacement Volume, which was in effect during the time the acts in dispute occurred, although Sections 6–201(a) and 6–202(8) have not been substantively changed in the 2006 Replacement Volume.

We shall hold that under Section 6-202(8) of the Courts and Judicial Proceedings Article, venue is proper in a medical malpractice and lack of informed consent action where the alleged misdiagnosis, negligent treatment, or negligent failure to inform, giving rise to the harm, occurs. We shall further hold in response to questions II and III that pursuant to Section 6-201(a) of the Courts and Judicial Proceedings Article, venue is determined when suit is brought, and medical privileges and appointments in Baltimore City, such as in issue in the present case, alone, are insufficient to establish venue in Baltimore City.

## I. Background

■ On January 31, 2005, Earlene Burnside and her husband, Johnny,[5] filed a complaint in the Circuit Court for Baltimore City against Dr. Randall Wong, alleging medical malpractice, lack of informed consent,[6] and loss of consortium. Mrs. Burnside's medical malpractice claim was based on the following allegations, in pertinent part:

5. In September 2001, Plaintiff Earlene Burnside sought ophthalmic care and treatment from Defendant Wong for her background, diabetic retinopathy in both of her eyes.

---

5. Mr. Burnside was a party to the litigation in conjunction with Petitioner's loss of consortium claim. In her brief, Mrs. Burnside advises that Mr. Burnside died during the proceedings and is no longer a party.

6. Lack of informed consent represents a cause of action, distinct from medical malpractice in Maryland. In *McQuitty v. Spangler*, 410 Md. 1, 18-19, 976 A.2d 1020, 1030 (2009), we recently opined that:

Breach of informed consent and medical malpractice claims both sound in negligence, but are separate, disparate theories of liability. In a count alleging medical malpractice, a patient asserts that a healthcare provider breached a duty to exercise ordinary medical care and skill based upon the standard of care in the profession, while in a breach of informed consent count, a patient complains that a healthcare provider breached a duty to obtain effective consent to a treatment or procedure by failing to divulge information that would be material to his/her decision about whether to submit to, or to continue with, that treatment or procedure.

(Internal citations omitted).

6. Defendant Wong performed a bilateral laser coagulation procedure on Ms. Burnside on November 15, 2001.

7. Ms. Burnside continued to seek ophthalmic care and treatment from Defendant Wong through June 2003, during which time the background, diabetic retinopathy condition in her eyes was allowed by Defendant Wong to progress into a more severe, vision threatening condition known as proliferative retinopathy.

8. On August 21, 2003, Defendant performed a surgical and a laser coagulation procedure on Ms. Burnside's left eye. On October 9, 2003, Defendant performed a laser coagulation procedure on Ms. Burnside's right eye, and then on December 18, 2003, he performed another laser coagulation procedure on Ms. Burnside's right eye.

9. To date, Ms. Burnside is totally blind in her right eye and legally blind in her left eye.

She further alleged the following, regarding Dr. Wong's breaches of the standards of care in support of her medical malpractice claim:

13. Defendant Wong failed to comply with and breached his duty and was negligent in that he:

(a) failed to establish the appropriate diagnosis for Plaintiff Burnside's ophthalmic condition;

(b) failed to properly manage and treat Plaintiff Burnside's ophthalmic condition;

(c) failed to halt the progression of Plaintiff Burnside's clinically significant vision threatening condition;

(d) failed to perform surgical treatment in a timely fashion;

(e) failed to properly care for, manage and treat Plaintiff Burnside's ophthalmic condition post-surgery;

(f) failed to apply the appropriate surgical technique during surgery to avoid complications;

(g) failed to apply adequate approach to treatment of encountered complications;

(h) failed to timely recognize and treat the Plaintiff Burnside's condition after surgery; and

(i) was otherwise negligent.

Mrs. Burnside also alleged, in support of her informed consent count, that:

16. Preoperatively, Defendant Wong, individually and through his agents and employees, had a duty to inform the plaintiff of the probability of success of the proposed surgeries, alternative methods of treatment, the risks of failure or unfortunate side affects, including the risks of blindness, and other factors which a reasonable patient would consider material in making a decision to undergo her surgeries.

17. Contrary to the accepted standards of medical and surgical care, the defendant, individually and/or through his employees and agents, failed to inform Earlene Burnside of the risks of serious consequences, including but not limited to blindness.

18. If Plaintiff Burnside had been informed that there was a material risk that she would suffer blindness and/or vision impairment, she would not have consented to undergo the surgeries.

19. As a direct and proximate result of the defendant's failure to inform Ms. Burnside of the likelihood of blindness and/or vision damage and/or serious damages resulting therefrom, Earlene Burnside underwent the surgery and has suffered, and will continue to suffer, severe and permanent injury to her vision, mental anguish, physical impairment and disfigurement, loss of enjoyment of life, and will be required to expend large sums of money for past and future medical and rehabilitative services.

In response, Dr. Wong filed a Motion to Dismiss for Improper Venue, asserting that although he held privileges to practice medicine at Mercy Medical Center in Baltimore City, he had not used the privileges since September 2003, and he otherwise did not reside or carry on a regular business in Baltimore City, pursuant to Section 6–201(a). Dr. Wong also argued that under Section 6–202(8), Mrs. Burnside's cause of

action arose in Baltimore County, because the allegedly negligent failure to diagnose, obtain informed consent, and treat Mrs. Burnside took place in his Baltimore County office. Thereafter, after having joined Omni Eye Specialists as a defendant,[7] Mrs. Burnside then filed an Opposition to Motion to Dismiss for Improper Venue, asserting, based upon Dr. Wong's deposition testimony, that he regularly examined forty to fifty patients per month at Mercy Medical Center during the period of September 2001 to December 2003, at the time of the alleged negligence, supporting venue in Baltimore City. Dr. Wong's deposition testimony relied upon was the following:

[Counsel for Mrs. Burnside]: So the only thing that would have changed from 2000 through 2001, 2002, and 2003, and I am going to say 2004, is the amount of actual surgeries you performed, correct?

[Dr. Wong]: Sure. Yes.

[Counsel]: But the amount of activities, seeing patients would have been the same over those years?

[Dr. Wong]: About the same, sure, except for 2004, I wasn't there.

[Counsel]: So, let's say through 2003 you would have seen in—from 2000 through 2003, you would have seen twenty to—I mean, sorry—forty to fifty patients per month at Mercy Hospital?

[Dr. Wong]: Sure.

[Counsel]: I'm almost done, Doctor. And your consultations would have been the same; it's the same activity?

[Dr. Wong]: Yes.

Mrs. Burnside also argued that because Dr. Wong held active-staff part-time privileges in the Department of Ophthalmology

---

7. The allegations supporting the joinder of Omni Eye Specialists were: 3. At all times relevant hereto Defendant Omnisburg, LLC, d/b/a Omni Eye Specialists (hereinafter, "Omni"), was a Maryland corporation authorized to and doing business in the State of Maryland. 4. At all times relevant hereto Defendant Wong was the actual and/or apparent agent, servant, and employee of Defendant Omni.

at Johns Hopkins Hospital through August 31, 2001, a part-time faculty appointment as an instructor in the Department of Ophthalmology at Johns Hopkins University School of Medicine through April 28, 2003, and held a volunteer·faculty appointment at the University of Maryland School of Medicine, such contacts, she asserted, coupled with Dr. Wong's work at Mercy Medical Center, were sufficient to render venue in Baltimore City proper.

After a hearing in which the parties argued venue solely on the basis of Section 6–201(a), Judge Pierson signed an Order on May 23, 2005, transferring the action to the Circuit Court for Baltimore County. He reasoned that Dr. Wong's contacts with Baltimore City at the time suit was brought were insufficient to confer venue in the City:

> I don't think that the facts really are the subject of dispute for purposes of the venue motion. And I think the facts are that Dr. Wong was treating patients [in Baltimore City] quite regularly up until 2003. There wasn't any basis for dispute that he was doing business in the City of Baltimore until that time.
>
> Since that time he's maintained various forms of privileges at Baltimore City institutions, but apparently has not examined, treated, consulted, or had any contact with any patients since that time. And apparently hasn't had any contact with those institutions since that time, but has simply confined himself to limiting those forms of affiliation on whatever advertising that maybe well—listing those forms of affiliation as part of his public persona. Let me put it that way.
>
> Now, so the question is, I think, I am required to focus on the time when I should determine doing business. And let me say part of the reason I think I have to is that I don't think merely having staff privileges or having hospital privileges is sufficient to be doing business. I haven't found any Maryland case law on that.

* * *

There's one out of state case ... and that's *Pulcini v. Doctor's Clinic*, 158 Mich.App. 56, 404 N.W.2d 702, which is an opinion of the intermediate appellate court in Michigan, which is the only opinion I could find on whether merely having privileges is enough to be doing business ... by a doctor and they said it wasn't.

But I don't rest the decision on that, but more on the fact that merely having privileges and not doing anything with them can be nothing more than a paper connection. And I don't think it has the continuity or the required volume of contact with the forum to constitute doing business within the meaning of the venue statute.

\* \* \*

I think it is a matter of statutory construction. And the statute is phrased in the present tense.

And the plaintiff makes a very strong argument that that's not necessarily dispositive because that's the only tense they could phrase it in, but I'm not completely persuaded by that argument.

I do agree that the past could be important in that if you had an individual who was engaging in a course of conduct over a number of years that regularity could be important in determining whether he or she continues to do business.... I think you have to look at the entire picture.

But this seems to me to be a case where factually there isn't any dispute that he stopped seeing patients in 2003. So I don't think this is a case where I could say because of the conduct in the past it would be a basis to infer that he's still doing business ... in this jurisdiction.

In terms of fairness the argument the plaintiff makes that this would sort of foster a race to get out of the jurisdiction before he could get sued. The other way to look at it would be it's within the plaintiff's power to determine when the defendant is sued. So from that standpoint you could say that it's just as fair to the plaintiff to look at the time when suit is brought, because it's the plaintiff who has control over when the suit is brought just as much as it's the

defendant who has control over where he or she conducts his activities or her activities.

\* \* \*

And it seems to me that the time when suit is brought is not an inappropriate time to measure doing business for purposes of venue. Even though I think arguments could be made that from a fairness standpoint if someone is regularly doing business at the time he or she commits the alleged tort it's fair to hold that he or she could be sued in the jurisdiction. But you could argue it the other way equally, which is ... what a valuable right it is to be sued where you reside. So you could say well fairness says it's as of the time you're being sued.

\* \* \*

And since I think it is clear from the words of the statute that it is the time when suit is brought, I believe there is no venue in Baltimore City.

Thereafter, Mrs. Burnside filed a Motion to Reconsider, Alter, Amend, or Revise the ruling transferring the action to Baltimore County, relying for the first time primarily on Section 6–202(8), arguing that a cause of action arises, for the purposes of venue, when facts exist to support each element of a negligence claim, namely, duty, breach, and injury. Mrs. Burnside asserted that her "first eye injury while under Dr. Wong's care" occurred at her residence in Baltimore City, relying on an affidavit executed by Dr. David Newsome, which, in relevant part, stated:

5. It is my opinion to a reasonable degree of medical probability that the first (but not only) eye injury that Mrs. Burnside suffered while under Dr. Wong's care was when her background retinopathy was allowed to progress to proliferative retinopathy, a more severe condition, despite indications for treatment that more likely than not would have prevented that progression. It is my opinion that this transition from background to proliferative retinopathy occurred between April 8, 2002 and September 16, 2002.

Dr. Newsome further opined that Mrs. Burnside's degenerative eye condition deteriorated to proliferative retinopathy at her residence in Baltimore City:

6. This transition from background to proliferative retinopathy was a gradual process. It is my understanding that Mrs. Burnside lived in Baltimore City between April 8, 2002 and September 16, 2002, as well as before and since that timeframe. It is my further understanding that though some of Mrs. Burnside's work activities took her into counties other than Baltimore City at times, she spent far more time in Baltimore City than in any other County during this period.

7. Based on the foregoing assumptions, and my understanding of the process of the transition from background to proliferative retinopathy, it is my opinion to a reasonable degree of medical probability that Mrs. Burnside's first eye injury while under Dr. Wong's care occurred more likely than not where she spent the vast majority of her time—in Baltimore City.

Mrs. Burnside then filed a second amended complaint asserting that Section 6–202(8) was an alternative basis for venue in Baltimore City, but Judge Pierson denied the Motion to Reconsider, Alter, Amend, or Revise his judgment transferring the case to Baltimore County. Mrs. Burnside filed an appeal to the Court of Special Appeals, which, in an unreported opinion, affirmed the decision of the circuit court judge.

The intermediate appellate court considered whether venue in Baltimore City existed at the time suit was brought under Sections 6–201(a) and 6–202(8). The court evaluated the present tense language of Section 6–201(a), as well as case law from sister jurisdictions interpreting the relevant time frame for "doing business" under venue statutes with similar language,[8] and concluded that the "proper time period for deter-

---

8. The intermediate appellate court, at the time of the filing of its unreported opinion, did not have the benefit of our analysis in *Nodeen v. Sigurdsson,* 408 Md. 167, 178, 968 A.2d 1075 (2009), filed on April 7,

mining whether a defendant carries on a regular business or habitually engages in a vocation is the time when the complaint is filed." The court further noted that Dr. Wong's medical privileges at Mercy Medical Center and teaching privileges at the University of Maryland School of Medicine were insufficient to confer venue in Baltimore City under Section 6–201(a), because these privileges were not being used since 2003, in the case of Mercy Medical Center, and the late 1990s, in the case of the University of Maryland. In evaluating whether venue was proper under Section 6–202(8), the court considered the parties' arguments regarding when a cause of action arises in a medical malpractice action involving an alleged misdiagnosis and lack of informed consent. Relying on our discussion of the definition of "injury" in related contexts, as well as our venue analysis in *Green v. North Arundel Hospital Association, Inc.*, 366 Md. 597, 785 A.2d 361 (2001), the Court of Special Appeals affirmed the transfer of the case to Baltimore County, reasoning that Mrs. Burnside suffered an injury, and thus her malpractice claim arose, "when Dr. Wong allegedly failed to diagnose her condition on April 8, 2002 in Baltimore County."

## II. Standard of Review

In statutory interpretation, our primary goal is "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." *Barbre v. Pope*, 402 Md. 157, 172, 935 A.2d 699, 708 (2007); *Gen. Motors Corp. v. Seay*, 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005). *See also Dep't of Health and Mental Hygiene v. Kelly*, 397 Md. 399, 419–20, 918 A.2d 470, 482 (2007). We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' " *Barbre*,

---

2009, and found persuasive similar analysis from other state courts. We need not do so because of the *Nodeen* precedent.

402 Md. at 172, 935 A.2d at 708, quoting *Kelly*, 397 Md. at 420, 918 A.2d at 482. *See also Kane v. Bd. of Appeals of Prince George's County*, 390 Md. 145, 167, 887 A.2d 1060, 1073 (2005). If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. *Barbre*, 402 Md. at 173, 935 A.2d at 708–09; *Kelly*, 397 Md. at 419, 918 A.2d at 482; *City of Frederick v. Pickett*, 392 Md. 411, 427, 897 A.2d 228, 237 (2006); *Davis v. Slater*, 383 Md. 599, 604–05, 861 A.2d 78, 81 (2004). "Occasionally we see fit to examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language." *Robey v. State*, 397 Md. 449, 454, 918 A.2d 499, 502 (2007), citing *Stanley v. State*, 390 Md. 175, 185, 887 A.2d 1078, 1084 (2005). "In such instances, we may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments." *Id.*

## III. Discussion

We are concerned in the present case with the specific application of our venue statute. Venue is one of a number of jurisprudential concepts relating to the competency of a court generally to render a valid judgment; others include subject matter and personal jurisdiction. While improper venue, generally, does not result in the termination of an action, lack of subject matter jurisdiction necessarily does, and lack of personal jurisdiction can.

Whether a court may exercise jurisdiction over a putative defendant is dependent on whether personal jurisdiction exists. The defense of lack of personal jurisdiction, unlike subject matter jurisdiction, is waived unless raised in a mandatory preliminary motion, Rule 2–322(a)(1); Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary* 202 (3rd ed. 2003), but if raised successfully may terminate the action. *Bond v. Messerman*, 391 Md. 706, 731–32, 895 A.2d 990, 1005–06 (2006).

Venue, unlike subject matter and personal jurisdiction, focuses largely on geographical nexus related to the

appropriate county in which an action may proceed. John A. Lynch, Jr. & Richard W. Bourne, *Modern Maryland Civil Procedure* 2–111 (2nd ed. 2004). The defense of improper venue, moreover, is waived unless timely raised in a preliminary motion, Rule 2–322(a)(2), Niemeyer & Schuett, *supra*, at 202, and once raised may result in a transfer of the action to the proper forum, rather than termination of the action altogether. Rules 2–327(b) and 3–326(a); *see Odenton Dev. Co. v. Lamy*, 320 Md. 33, 41, 575 A.2d 1235, 1238 (1990); *Payton–Henderson v. Evans*, 180 Md.App. 267, 274, 949 A.2d 654, 657–58 (2008).

▆▆▆ The present case involves the interpretation of two statutory sections defining venue.[9] The first, Section 6–201(a) states in relevant part:

(a) *Civil actions.*—Subject to the provisions of §§ 6–202 and 6–203 and unless otherwise provided by law, a civil action shall be brought in a county where the defendant . . . carries on a regular business . . . or habitually engages in a vocation.

The second, Section 6–202(8) in pertinent part provides:

(8) Tort action based on negligence—Where the cause of action arose;

The major focus of this case, however, concerns when a "cause of action" arises under Section 6–202(8) of the venue statute. Mrs. Burnside posits, citing *Green v. North Arundel Hospital Ass'n.*, 366 Md. 597, 612, 785 A.2d 361, 369–70 (2001), *cert. denied*, 535 U.S. 1055, 122 S.Ct. 1913, 152 L.Ed.2d 823 (2002), that a cause of action in negligence arises when facts exist to support each element of the action, including injury, and she did not, as a matter of law, sustain an injury resulting from the misdiagnosis and failure to obtain informed consent until her less severe background retinopathy progressed into proliferative retinopathy, which she characterizes as a more severe condition. She further asserts, based upon the affidavit of her

---

**9.** The parties have presented only Section 6–201(a) and Section 6–202(8) for our analysis.

expert, Dr. David Newsome, that this worsening of her condition occurred some time between her April and September visits to Dr. Wong's Baltimore County office, so that she first suffered an injury at her residence in Baltimore City. She asserts as the timeline for the progression, the following:

Mrs. Burnside had symptomatic background retinopathy in September 2001 when she first saw Dr. Wong; she had symptomatic background retinopathy when she saw him on April 8, 2002. By the next office visit, on September 16, 2002, Mrs. Burnside had proliferative retinopathy, a more severe condition, meaning the worsening took place after April 8 and before September 16.

Dr. Wong counters, also relying on *Green,* 366 Md. at 612, 785 A.2d at 369–70, that in the context of a degenerative illness, such as diabetic retinopathy, a cause of action arises when the patient's symptoms are permitted to progress, so that Mrs. Burnside's cause of action arose in Baltimore County, when she was allegedly misdiagnosed, mistreated and misinformed, permitting her background retinopathy to progress.

 A review of the legislative history of Section 6–202(8) indicates that the provision was first enacted in 1945, as part of a general venue statute. The General Assembly added to then Section 157 of Article 75, Maryland Code (1939), the following language:

In any action ex delicto in which all of the defendants are not residents of, nor carrying on regular business in, nor habitually engaged in any avocation or employment in one county, the plaintiff may, at his election, sue all said defendants in the county *where the cause of action arose.*

1945 Maryland Laws, Chapter 468 (emphasis added). An action "ex delicto" "imputes a tort done either to the person or property of another. . . ." *Stewart v. United Electric Light & Power Co.,* 104 Md. 332, 334, 65 A. 49, 50 (1906). *See* John P. Poe, *Pleading and Practice in Courts of Common Law* 154 (3rd ed. 1897) (describing an action ex delicto as one encom-

passing the six common law actions of case, trover, trespass, replevin, ejectment, and dower).

In 1954, the statute, then Section 158 of Article 75, Maryland Code (1951), was amended to permit an "ex delicto" action against multiple defendants also to be brought where any of the defendants reside:

> In any action ex delicto in which all the defendants are not residents of, not carrying on regular business in, or habitually engaged in any avocation or employment in one county, the plaintiff may, at his election, sue all said defendants in the county where the cause of action arose *or sue all of the said defendants in the county where any one of the defendants reside.*

1954 Maryland Laws, Chapter 60 (emphasis in original). In 1961, the General Assembly enacted a new provision, adding the language of negligence:

> In any action ex delicto *based upon negligence,* the plaintiff at his election may sue the defendant or defendants in the county where the cause of action arose.

1961 Maryland Laws, Chapter 603 (emphasis added).[10]

At no time in this history was the phrase "cause of action arose" defined, and it was in this context that we first had the opportunity to consider what the phrase in Section 6–202(8) meant in the context of venue. In *Green v. North Arundel Hospital Ass'n,* 366 Md. 597, 785 A.2d 361 (2001), Darwin Green was born with hydrocephalus, a medical condition requiring two shunts to be placed in his brain when he was born in 1977. At the age of 11, Darwin, experiencing severe

---

**10.** The statute was amended in 1966, so that Section 75 of Article 75, Maryland Code (1957, 1969 Repl.Vol.) then read:

> (c) In any action ex delicto based upon negligence, the plaintiff at his election may sue the defendant or defendants in the county where the cause of action arose.

In 1973, the General Assembly repealed Section 75 of Article 75 and enacted Section 6–202 of the Courts and Judicial Proceedings Article; the newly enacted Section 6–202(8) contained "new language derived from Art. 75, § 75(c)." Revisor's Note, 1973 Md. Laws, Special Session, Chap. 2.

headaches, vomiting, and drowsiness, was brought to North Arundel Hospital, an Anne Arundel County hospital, by his father. The physician on duty, Dr. Fields, ordered an emergency CT scan, which indicated several abnormalities that a radiologist attributed to "old changes," and Dr. Fields discharged Darwin after prescribing painkillers. The next morning, Darwin's father took him to his pediatrician's office in Anne Arundel County, because the child continued to complain of headaches. The pediatrician also noted that Darwin appeared drowsy and was staggering and immediately arranged to transfer him to the University of Maryland Hospital in Baltimore City. Doctors at that Hospital determined that Darwin "had increased intracranial pressure" requiring surgical correction. The next day, Darwin suffered a cardiac arrest, which left him severely brain-damaged and in an essentially vegetative state.

Darwin's parents filed suit in the Circuit Court for Baltimore City against North Arundel Hospital Association, and Dr. Fields, who immediately moved to dismiss the action for improper venue.[11] The Circuit Court concluded that under Section 6–201(b), venue lay only in Anne Arundel County, and transferred the case to the Circuit Court for Anne Arundel County. When a trial ended with judgments in favor of the defendants, Darwin's parents pursued the issue of improper venue on appeal. The Court of Special Appeals, *Green v. North Arundel Hospital Ass'n.*, 126 Md.App. 394, 414, 730 A.2d 221, 232 (1999), held that the Circuit Court erred in determining that Section 6–202(8) was inapplicable, but that the error was harmless because the cause of action arose in Anne Arundel County.

---

11. The University of Maryland Hospital and eleven health care providers at that Hospital were originally named as respondents before the Health Claims Arbitration Office. We noted that these respondents, "apparently either resided or did business in Baltimore City." *Green v. North Arundel Hospital Ass'n.*, 366 Md. 597, 604, 785 A.2d 361, 365 (2001). The University of Maryland respondents ultimately settled with the plaintiff while the case was pending arbitration.

We granted certiorari to consider the parents' claim that the "cause of action arose" when Darwin suffered his grievous injury, the cardiac arrest in Baltimore City. *Green*, 366 Md. at 607, 785 A.2d at 367. We recognized, however, that the cause of action arose in Anne Arundel County because Darwin's symptoms, in existence at the time of misdiagnosis, continued to exist:

> Although the plaintiff seeks now to brush it aside, the fact is that, as a result of the alleged negligence of the Anne Arundel County defendants in failing to diagnose the shunt malfunction and have Darwin sent immediately to a facility capable of dealing with that problem, Darwin continued to suffer from headaches, drowsiness, and neurological deterioration.

*Id.* at 612, 785 A.2d at 369–70. We also recognized that a medical injury may occur "even though all of the resulting damage to the patient" has not yet occurred, *id.* at 608, 785 A.2d at 368, citing *Oxtoby v. McGowan*, 294 Md. 83, 97, 447 A.2d 860, 868 (1982), so that although Darwin had suffered a cardiac arrest in Baltimore City, his injury, nevertheless, originated or emanated from allegedly negligent diagnosis and treatment in Anne Arundel County:

> It is evident that the Court of Special Appeals reached the only conclusion possible—that "because appellant's own evidence showed that Darwin *first* experienced injury in the form of 'neurological deterioration' and pain and suffering in Anne Arundel County, the cause of action arose in that county."

*Id.* at 612, 785 A.2d at 370, quoting *Green*, 126 Md.App. at 414, 730 A.2d at 232. We concluded, therefore, that venue is proper where the patient "first experience[s] injury" in the form of a progressive deterioration, rather than the site of ultimate injury, as in *Green*, Darwin's cardiac arrest.

In so concluding that the phrase "where the cause of action arose" did not refer to the site of the ultimate injury, but to the disease progression, we explored cases in which venue was not in issue, those being *Oxtoby v. McGowan*, 294 Md. 83, 447

A.2d 860 (1982), *Owens–Illinois v. Armstrong,* 326 Md. 107, 604 A.2d 47 (1992), *Jones v. Speed,* 320 Md. 249, 577 A.2d 64 (1990), and *Rivera v. Edmonds,* 347 Md. 208, 699 A.2d 1194 (1997).

In *Oxtoby v. McGowan,* 294 Md. 83, 447 A.2d 860 (1982), we considered whether Layla Oxtoby suffered a "medical injury," such that her medical malpractice claim arose prior to the effective date of the Health Claims Arbitration Act, Section 3–2A–01 to 3–2A–09 of the Courts and Judicial Proceedings Article, Maryland Code (1974, 1980 Repl.Vol., 1981 Supp.), under which her claims would have been subject to arbitration. The clause in issue provided that the Act "shall take effect July 1, 1976, and shall apply only to medical *injuries occurring on and after that date.*" 1976 Maryland Laws, Chapter 235, Section 5 (emphasis added). In 1974, Dr. McGowan performed a complete hysterectomy on Mrs. Oxtoby, due to her family history of ovarian cancer. In 1977, however, ovarian cancer was diagnosed, and surgery to attempt to remove the cancer revealed that portions of Mrs. Oxtoby's left ovary and fallopian tube were intact. Mrs. Oxtoby died as a result of the cancer on June 17, 1980, and Mr. Oxtoby and his two children filed wrongful death and survival claims against Dr. McGowan, alleging medical malpractice in failing to remove all of the ovary and fallopian tube.

Dr. McGowan filed a motion to dismiss, asserting that the claims needed to have been first submitted to arbitration. We disagreed, concluding that there was evidence in the record that the cancer, though not diagnosed until 1977, was contracted prior to the effective date of the Act. In so holding, we conceived "injury" in terms of "the effect on the recipient in the way of hurt or damage." 294 Md. at 94, 447 A.2d at 866 (citations omitted). We further reasoned that the wrongful death and survival claims could proceed, concluding that "a medical injury occurs ... even though all of the resulting damage to the patient has not been suffered prior to the Act's effective date." *Id.* at 97, 447 A.2d at 868. In other words, because Mrs. Oxtoby contracted cancer prior to the Act's effective date, the wrongful death and survival claims were not

subject to the procedural requirements of the Act, although Mrs. Oxtoby died in 1980, after the Act's effective date.

In *Owens–Illinois v. Armstrong*, 326 Md. 107, 604 A.2d 47 (1992), *cert. denied*, 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992), we had occasion to evaluate the applicability of the statutory cap on non-economic damages in an asbestos-related claim. The language of the statutory cap provision, Section 11–108 of the Courts and Judicial Proceedings Article, Maryland Code (1974, 1989 Repl.Vol.), included language similar to that in Section 6–202(8):

(b) *Limitation of $350,000 established.*—In any action for damages for personal injury in which *the cause of action arises* on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

(Emphasis added). In the case, *Owens–Illinois*, the manufacturer of products containing asbestos contended that Armstrong's cause of action "arose" in September of 1987, when Armstrong was first diagnosed with asbestosis, so that his award for noneconomic damages was subject to the statutory cap. We rejected that argument, relying on the definition of the word "arise," which we added was "to come into being; originate." 326 Md. at 121, 604 A.2d at 54. Applying this understanding, based upon the progression of the disease over a twenty year period, we reasoned that Armstrong had been exposed to large amounts of asbestos from 1943 to 1963, and that the cause of action would have had to develop, at the latest, by 1983. We concluded that the cause of action arose, then, prior to 1986, so that Armstrong's damage award was not controlled by the cap on noneconomic damages. *Id.* at 123–24, 604 A.2d at 55.

In the third case cited in *Green*, that of *Jones v. Speed*, 320 Md. 249, 577 A.2d 64 (1990), we considered the effect of the statute of limitations on a medical malpractice claim relating to a progressive illness. In that case, Elizabeth Jones had consulted Dr. Speed, a specialist, in July of 1978 because she was suffering from debilitating headaches. Dr. Speed continued to treat Mrs. Jones until September of 1985, for a total of

sixteen visits without ordering a CAT scan or other radiographic studies. In February of 1986, Mrs. Jones suffered a seizure, and a CAT scan revealed a tumor, which was successfully removed by another doctor. Mr. and Mrs. Jones filed a complaint against Dr. Speed in July of 1986, alleging negligent failure to properly diagnose Mrs. Jones' condition. In his defense, Dr. Speed relied upon the statute of limitations, which provided:

(a) *Limitations.*—An action for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider, as defined in § 3–2A–01 of this article, shall be filed within the earlier of:

(1) Five years of the time the injury was committed; or

(2) Three years of the date the injury was discovered.

Maryland Code (1974, 1989 Repl.Vol.), Section 5–109(a) of the Courts and Judicial Proceedings Article. Dr. Speed contended "that the injury that is the gravamen of the complaint" occurred on July 17, 1978, at the first visit when the initial misdiagnosis was made. We agreed, noting that negligence, namely the misdiagnosis, produced an "injury" on July 17, 1978, but, we concluded, relying on an affidavit of Mrs. Jones' expert, that every successive misdiagnosis represented a separate injury:

Each time that Mrs. Jones saw Dr. Speed, a separate medical injury occurred, because of the failure of Dr. Speed, at each of these visits, to detect a progressively worsening and changing medical condition.

Each severe and prolonged headache, and the final seizure, grew out of a series of medical injuries directly caused by the carelessness of the treatment administered by Dr. Speed.

320 Md. at 256, 577 A.2d at 67. We concluded that Mrs. Jones' claims for misdiagnosis stemming from her September 1981 visit to Dr. Speed and from subsequent visits, were not time barred. *Id.* at 261, 577 A.2d at 69.

Finally, our analysis in *Green* also included reference to *Rivera v. Edmonds,* 347 Md. 208, 699 A.2d 1194 (1997), which

also involved the application of the statute of repose to a failure to diagnose medical malpractice claim; Section 5–109(a) of the Courts and Judicial Proceedings Article provided that a medical negligence claim must be filed within "[f]ive years of the time the injury was committed." In *Rivera*, Deborah Edmonds was diagnosed with "fully differentiated squamous cancer" in November of 1989; she died on April 11, 1990. The widower and child of Mrs. Edmonds filed wrongful death and survival claims in 1993 against two pathologists, Dr. Jaffurs and Dr. Rivera, and their respective employers, Cytology Services of Maryland, Inc. and Ivan R. Mattei, M.D., P.A. The Edmonds alleged that in 1983 Mrs. Edmonds underwent cervical biopsies, and that Drs. Jaffurs and Rivera failed to diagnose "invasive carcinoma" evident in the microscopic slides of those biopsies. Drs. Jaffurs and Rivera moved for summary judgment, asserting that "the alleged negligent acts or omissions by the defendants occurred nearly ten years prior" to the filing of the complaint, and were time barred. 347 Md. at 214, 699 A.2d at 1198. In their opposition to summary judgment, the Edmonds argued that the injury to Mrs. Edmonds occurred no earlier than May 1, 1989, when the cancer caused radiating leg pain of which Mrs. Edmonds complained to her physician, leading to the diagnosis.

After exploring the nature of microscopic cervical cancer, we concluded that "the cancer that allegedly should have been detected in Mrs. Edmonds in July 1983 could remain dormant for as long as five years," so that Mrs. Edmonds suffered "no additional adverse consequences if the microscopic tumor remain[ed] unchanged." Therefore, she could have suffered an injury as late as July 1988, such that her claim was timely. We recognized, however, that "any delay, and certainly a protracted delay, caused by a misdiagnosis is a harm," in cases such as *Jones*, in which the disease is "progressing and worsening during the period following the misdiagnosis, even if the cancer was asymptomatic." 347 Md. at 223, 699 A.2d at 1202.

In *Green*, in reliance on these four cases, we concluded that Darwin *"first* experienced injury" in Anne Arundel County as

a result of the alleged negligence of the North Arundel Hospital defendants in failing to diagnose the shunt malfunction, and immediately take steps to curb Darwin's "neurological deterioration," rather than at the time of his cardiac arrest in Baltimore City. 366 Md. at 612, 785 A.2d at 369–70. It is this language of "first injury" that presents the challenge in this case, because Mrs. Burnside asserts that well before, and on April 8, 2002, she presented to Dr. Wong with symptoms of background diabetic retinopathy, but that by her next office visit, on September 16, 2002, she had proliferative diabetic retinopathy, a more severe condition, and therefore she "first experienced injury" when the condition worsened, likely in Baltimore City. Dr. Wong counters by saying that Mrs. Burnside's diabetic retinopathy existed and was progressing on April 8, 2002 and any alleged misdiagnosis, failure to obtain informed consent, or mistreatment on that date constituted an injury in Baltimore County. The Court of Special Appeals agreed, reasoning that under *Jones, Rivera,* and *Green,* Mrs. Burnside suffered an injury, and thus her malpractice claim arose, when Dr. Wong allegedly failed to diagnose her condition on April 8, 2002.

Both parties before us are able to seek refuge in *Green's* holding regarding Section 6–202(8), because the cases upon which *Green* relied did not deal with *where,* but rather *when* an injury occurred.[12] When, however, we articulate the principles derived from the four fundamental cases upon which *Green* relied, we can parse their applicability to the instant case. In *Oxtoby,* we conceived "injury" in the context of a progressive illness, ovarian cancer, in terms of "the effect on the recipient in the way of hurt or damage," and noted that "a

---

12. A statute of limitations, we have stated, is designed foremost to "provide adequate time for diligent plaintiffs to file suit...." *Georgia Pacific Corp. v. Benjamin,* 394 Md. 59, 85, 904 A.2d 511, 526 (2006), citing *Pierce v. Johns–Manville Sales Corp., et al.,* 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983), and failure to timely file is a bar to recovery. Improper venue does not, on the other hand, bar recovery, because the complainant may still sue for the damages requested, but in the appropriate county.

medical injury occurs ... even though all of the resulting damage to the patient" has not yet occurred. 294 Md. at 94, 97, 447 A.2d at 866, 868. In *Owens–Illinois*, we recognized that a cause of action arises when it comes into being or originates, such that the claim for asbestosis came into being prior to diagnosis. 326 Md. at 124, 604 A.2d at 55. From *Jones*, we can ascertain that in the context of "a progressively worsening and changing medical condition," a separate medical injury occurs upon each misdiagnosis. 320 Md. at 256, 577 A.2d at 67. And in *Rivera*, we recognized that "any delay, and certainly a protracted delay, caused by a misdiagnosis is a harm" where the disease is "progressing and worsening during the period following misdiagnosis." 347 Md. at 223, 699 A.2d at 1202.

In *Green*, the application of these principles dictated that a cause of action arose under Section 6–202(8) at the situs of the alleged misdiagnosis or negligent treatment in a disease progression, and not at the place of the ultimate harm. Although Darwin Green had experienced the fullness of his injury when he arrested in Baltimore City, we recognized that venue was nevertheless proper in Anne Arundel County, because the disease progression upon which the misdiagnoses occurred, was there. *Green*, 366 Md. at 611–12, 785 A.2d at 369–70.

Application of the fundamental principles underlying *Green* to the present case yields the conclusion that the instant cause of action arose in Baltimore County. The failure to obtain informed consent could only occur at the site of the omission. The progressively worsening retinopathy and the potentiality of the ultimate harm, the proliferative type, had to coexist at the time of the alleged misdiagnosis, so that the allegation of failure to properly diagnose and treat could not arise absent the presence of the disease and its potentiality.[13] Accepting,

---

**13.** The dissent asserts, without record basis, that Mrs. Burnside's condition was "asymptomatic," and that as a result, "[y]ou cannot simultaneously have an asymptomatic injury resulting from a failure to diagnose." In fact, however, Dr. Newsome, Mrs. Burnside's expert, opined that she presented to Dr. Wong with symptoms of background diabetic retinopathy, from which proliferative retinopathy gradually progressed.

for our purposes, that the transition from background to proliferative diabetic retinopathy represents a gradual process, as Dr. Newsome suggests, the disease must have been germinating, as was the disease in *Owens–Illinois,* where we also interpreted the language of arising, 326 Md. at 121, 604 A.2d at 54, for Dr. Wong's negligent acts to constitute misdiagnosis and mistreatment.[14] Therefore, Mrs. Burnside's cause of action arose in Baltimore County, where Dr. Wong's alleged misdiagnosis, mistreatment, and failure to obtain informed consent occurred.

We turn now to the next issue, namely, whether venue in Baltimore City is proper under Section 6–201(a), which provides in pertinent part:

> (a) *Civil actions.*—Subject to the provisions of §§ 6–202 and 6–203 and unless otherwise provided by law, a civil action shall be brought in a county where the defendant ... carries on a regular business ... or habitually engages in a vocation.

Mrs. Burnside argues that venue should be determined as of the time the alleged negligence occurred, rather than at the time suit was brought, relying on *Simmons v. Urquhart,* 101 Md.App. 85, 643 A.2d 487 (1994). Mrs. Burnside asserts that at the time of the alleged negligence, from 2001 to 2003, Dr. Wong had practiced medicine in Baltimore City. More specifically, she argues that Dr. Wong regularly examined forty to fifty patients per month at Mercy Medical Center during 2000 to 2003, maintained medical privileges at Johns Hopkins Hospital through August 2001, a part-time faculty appointment at Johns Hopkins University School of Medicine through 2003, and a volunteer faculty appointment as a Clinical Assistant

---

14. In her brief in this Court, Mrs. Burnside contends that her allegation "is not that Dr. Wong misidentified her condition as of April 8, 2002.... Rather, he should have followed her more closely after April 8, 2002—seeing her well before September 16, 2002—thereby observing and acting upon the 'indications for treatment that more likely than not would have prevented her progression to proliferative retinopathy.'" (citations omitted). Mrs. Burnside appears to be asserting a claim for medical monitoring, which we have not recognized, nor have been called upon to do in the present case.

Professor at the University of Maryland School of Medicine as of the filing of the complaint, all in Baltimore City. Alternatively, she posits that even if we conclude that the time suit was brought is determinative in analyzing venue regarding carrying on a regular business or engaging in a vocation under Section 6–201(a), venue is proper in Baltimore City, because Dr. Wong maintained medical privileges at Mercy Medical Center, teaching privileges at the University of Maryland Medical School, and generally held himself out to the public as a physician serving the greater Baltimore area.

Dr. Wong counters, relying on both the legislative history of Section 6–201(a) as well as our recent decision in *Nodeen v. Sigurdsson*, 408 Md. 167, 178, 968 A.2d 1075 (2009), that the relevant time for determining venue under Section 6–201(a), pertaining to carrying on a regular business or engaging in a vocation, is the time suit was brought. Dr. Wong further argues that when Mrs. Burnside brought her claim, his maintenance of medical privileges and teaching appointments in Baltimore City did not constitute the substantial and persistent course of conduct that Section 6–201(a) contemplates.

We begin by analyzing the plain meaning of Section 6–201(a). As the Court of Special Appeals noted, the provision is cast entirely in the present tense. The use of the words, "carries" and "engages," coupled with the phrase, "a civil action shall be brought," evinces the intent of the Legislature to establish a time requirement in the present for determining the proper venue. In other words, a civil action, in this regard, may be filed only in a county where the defendant, at the time of filing, carries on a regular business, or habitually engages in a vocation.

This conclusion is consistent with our recent decision in *Nodeen*, 408 Md. at 167, 968 A.2d at 1075, in which we considered whether the word "resides" mandates consideration of venue at the time suit was instituted. In that case, we analyzed venue under Section 6–202(5) of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl. Vol.), which provides:

(5) Action relating to custody, guardianship, maintenance, or support of a child—Where the father, alleged father, or mother of the child resides, or where the child resides;

When a non-custodial mother filed a complaint for modification of custody in Calvert County where she resided, the Circuit Court transferred the action to Anne Arundel County, reasoning that the Circuit Court for Anne Arundel County was the situs of the original custody order. We disagreed, concluding that pursuant to Section 6–202(5), Calvert County was a proper venue, because the mother filed her complaint in the county where she resided at the time of filing. We further held that "[t]he legal sufficiency of the forum selected is determined at the time of filing." 408 Md. at 178, 968 A.2d at 1082. The present tense versions of "carries on a regular business . . . or habitually engages in a vocation" in Section 6–201(a), mandates the same result.

Although Mrs. Burnside argues that the present tense wording of section 6–201(a) "pragmatically encompasses the entire period of viability of a negligence case—the point when the defendant breaches his/her duty—through the period when the breach causes an injury—through the expiration of the statute of limitations or the filing of the Complaint," this contention is misplaced. Mrs. Burnside relies on *Simmons*, 101 Md.App. at 85, 643 A.2d at 487, in which the Court of Special Appeals considered whether a circuit court possessed inherent authority to transfer an action on the basis of *forum non conveniens*, embodied in Rule 2–327(c). That Rule stated:

> On the motion of any party, the court may transfer any action to any other circuit court where the action might have been brought if the transfer is for the convenience of the parties and witnesses and serves the interests of justice.

Rule 2–327(c). In *Simmons*, Mrs. Simmons and her three children filed a wrongful death and survival action against Dr. Urquhart, Dr. Tullner, and Maryland Cardiology Associates, P.A. in Prince George's County Circuit Court, following the death of Mr. Simmons from a pulmonary embolism. Mary-

land Cardiology Associates maintained three offices, two located in Montgomery County and one located in Prince George's County. The cardiologists filed a motion to dismiss, or in the alternative, a motion to transfer the action to Montgomery County, alleging improper venue.

During oral argument on the venue motion, the Circuit Court judge recognized that defense counsel's argument was premised on the doctrine of *forum non conveniens* and ultimately transferred the action to Montgomery County. After the jury determined that the decedent's contributory negligence barred the Simmons' recovery, on appeal, the Simmons argued that the Circuit Court judge lacked authority to transfer the case on his own initiative because the Rule states that a trial court may transfer the action "[o]n motion of any party." Rule 2–327(c). The intermediate appellate court disagreed, reasoning on the bases of meeting minutes of the Rules Committee and federal precedent interpreting the federal statute authorizing case transfers, that "Maryland trial courts possess the authority to transfer cases sua sponte under Rule 2–327(c)." 101 Md.App. at 103, 643 A.2d at 496. The Court of Special Appeals, however, concluded that the transfer to Montgomery County was an abuse of discretion, because the defendant cardiologists failed to adduce proof regarding how an action in Prince George's County would inconvenience them or any potential witnesses. *Id.* at 106–07, 643 A.2d at 497–98.

We reversed, reasoning that "because the express language of Md. Rule 2–327(c) requires that a party first make a motion prior to a case being transferred on the grounds of *forum non conveniens,* a trial court may not act on its own initiative in transferring a case under that rule." *Urquhart v. Simmons,* 339 Md. 1, 15, 660 A.2d 412, 419 (1995). We further concluded, however, that defendants' motion was sufficient to support a transfer for *forum non conveniens,* and therefore the trial court did not transfer the action on its own initiative. Finally, we held that "the trial court was within its discretion in determining that the balance [of convenience] weigh[ed]

strongly in favor of transferring the action to Montgomery County." *Id.* at 18, 660 A.2d at 420.

Mrs. Burnside makes much of the fact that the Court of Special Appeals, in its recitation of facts, noted "[i]t is undisputed that, *at the time the events giving rise to this appeal occurred,* [Maryland Cardiology Associates] maintained three offices." 101 Md.App. at 89, 643 A.2d at 489 (emphasis added by Mrs. Burnside), and posits that an inference can be drawn from that case that "the period when a cause of action accrues is an applicable venue consideration," because the intermediate appellate court expressly referred to that period. We disagree. In addition to the fact that in *Simmons,* the Court of Special Appeals considered the contours of the doctrine of *forum non conveniens,* rather than venue under Section 6–201(a), the posited language was merely a factual reference rather than a dispositive consideration.

██ We conclude that, generally, the proper time for determining venue dependent on where a defendant carries on a regular business or habitually engages in a vocation is at the time suit is brought, which in the present case is Baltimore County.

██ Our final task, then, is to consider whether Dr. Wong's professional contacts with Baltimore City at the time suit was brought are sufficient to sustain venue there. Mrs. Burnside argues that Dr. Wong maintained "active privileges" at Mercy Medical Center and "teaching privileges" at the University of Maryland School of Medicine, even after the initial complaint was filed. Mrs. Burnside further notes that Dr. Wong held himself out as a retina specialist to the public, particularly Baltimore City residents, and these contacts taken together permit venue in Baltimore City.

Dr. Wong contends, conversely, that at the time that Mrs. Burnside instituted her action, he did not have the requisite business contacts with Baltimore City, as required by Section 6–201(a).

In *Dodge Park Enterprises, Inc. v. Welsh,* 237 Md. 570, 207 A.2d 503 (1965), we considered whether a lawsuit was properly filed in Montgomery County against three attorneys whose office was located in Prince George's County. The complaint alleged that the attorneys generally practiced law throughout the State of Maryland, and in particular, Montgomery and Prince George's Counties. The Circuit Court granted the motion to dismiss, and we remanded to determine whether the attorneys "regularly pursue[d] their profession as lawyers in Montgomery County." *Id.* at 573, 207 A.2d at 504. We emphasized that "the regular business or habitual avocation or employment' contemplated by [Section 6–201(a)] include[s] '* * * the continuous pursuit of some calling or profession, such as is ordinarily engaged in as a means of livelihood or for the purpose of gain or profit.'" *Id.* at 572, 207 A.2d at 504, quoting *National Bank of Baltimore v. Steele,* 143 Md. 484, 487, 122 A. 633, 634 (1923). Thereby, "continuous pursuit of some calling or profession" is a prerequisite under Section 6–201(a).

In the present case, Judge Pierson determined that Dr. Wong was not carrying on a regular business or habitually engaging in the practice of medicine in Baltimore City at the time suit was brought in 2005. Judge Pierson emphasized, "I don't think merely having staff privileges or having hospital privileges is sufficient to be doing business," and further found, "having privileges and not doing anything with them can be nothing more than a paper connection." These conclusions are amply supported by the record. Dr. Wong testified, for example, in his deposition that although he held medical privileges at Mercy Medical Center, he had not exercised them since 2003:

[Counsel for Dr. Wong]: Do I understand from the questions that we've been through today that the last time that you saw a patient for a medical anything was in September of '03 at Mercy Medical Center?

[Dr. Wong]: That is correct.

[Counsel]: And since that time you have not seen, cared for, treated, consulted or provided medical services for anybody in the city of Baltimore, is that correct?

[Dr. Wong]: That's correct.

[Counsel]: You saw the plaintiff in this case, Mrs. Burnside, and provided medical treatment to her; did any of that medical care and treatment occur, to your knowledge, in Baltimore City?

[Dr. Wong]: Did not.

Similarly, Barbara Elizabeth Rose, the Manager of Medical Staff Services at Mercy Medical Center, testified in her deposition that despite maintaining medical privileges at Mercy Medical Center from December 15, 1993 through April 13, 2005, Dr. Wong had no actual involvement at the facility since 2003:

[Counsel]: Do you know whether Dr. Wong participated in any medical education through Mercy Medical Center?

[Ms. Rose]: No, he did not.

* * *

[Counsel]: And to the best of your knowledge, Dr. Wong never participated in any teaching involving any residents or fellows? [Ms. Rose]: That's correct.

* * *

[Counsel]: And have you looked to see whether Dr. Wong participated in teaching any continuing medical education courses?

[Ms. Rose]: I did check. He did not participate in any [continuing medical education] programs nor did he teach at any.

* * *

[Counsel]: What types of volunteer work are there, clinics and things like that that you have?

[Ms. Rose]: There's clinics. That I think would be the most where he would be involved but there was no—he didn't participate.

Moreover, although Dr. Wong maintained teaching privileges at the University of Maryland School of Medicine at the time the present action was instituted, the record indicates that he had not taught, volunteered, or participated in research at the school since around 1997. Specifically, Dr. Wong, in his deposition, described his involvement with the University of Maryland School of Medicine between 2000 and 2004 as "zero."

Finally, Judge Pierson's findings are supported in the record by the deposition testimony of Dr. Wong, regarding his contacts with Johns Hopkins, or lack thereof, at the time the suit was brought:

[Counsel for Mrs. Burnside]: Then let's go to Johns Hopkins for this entry on your C.V. What is incorrect about that?

[Dr. Wong]: I am pretty sure I lost my ophthalmic privileges to [the Wilmer Eye Institute at Johns Hopkins] in the nineties or at the very least I haven't been to Johns Hopkins to see patients probably since 1997 or 1998.

Therefore, Judge Pierson concluded that "listing those forms of affiliation as part of [Dr. Wong's] public persona" were insufficient to confer venue in Baltimore City. Judge Pierson's findings are clearly supported by the record and his conclusions are sound.

In a similar situation, a Michigan intermediate appellate court has addressed whether merely holding, but not actively utilizing, medical privileges constitutes "conducting business" for the purposes of venue. In *Pulcini v. Doctor's Clinic, P.C.*, 158 Mich.App. 56, 404 N.W.2d 702 (1987), the plaintiffs argued that venue in Wayne County was proper because the defendant doctor held privileges, entitling him to participate in an ophthalmology residency training program and to admit patients, at two Wayne County hospitals.[15] Although the defen-

---

15. The relevant Michigan venue statute provides that venue is proper in "[the] county in which a defendant resides, or has a place of business, or conducts business, or in which the registered office of a defendant

dant doctor paid annually to have those privileges, he had never admitted patients to the hospital and had never taught there. *Id.* at 703. The trial court concluded that venue in Wayne County was proper, ruling that "a doctor who has the privilege to admit patients to a Wayne County hospital is doing business in Wayne County." *Id.* The Court of Appeals of Michigan reversed, reasoning Wayne County was an improper venue for the lawsuit:

> In this case, [the doctor] had merely the right to admit patients to two Wayne County hospitals operated by the Detroit Osteopathic Hospital Corporation. He never exercised that right. It is not disputed that he was a member of the corporation only so that he could participate in the residency training program. He did not have a "real presence" or systematic or continuous business dealings in Wayne County.

*Id.* at 704. This analysis is consistent with our reasoning today. Because Dr. Wong merely held privileges at Baltimore City institutions, without more, his ties to Baltimore City were insufficient to confer venue there.

▆▆▆ Therefore, we conclude that venue was proper in Baltimore County, because the cause of action arose there pursuant to Section 6–202(8), and because at the time suit was brought, when venue is properly determined under Section 6–201(a), Dr. Wong had only incidental connections to Baltimore City, while he regularly practiced medicine in Baltimore County.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

BELL, C.J., dissents and files opinion.

---

corporation is located." *Pulcini v. Doctor's Clinic, P.C.,* 158 Mich.App. 56, 404 N.W.2d 702, 703, n. 3 (1987).

**216**

Dissenting Opinion by BELL, Chief Judge.

At the commencement of this action, Mrs. Earlene Burnside had resided in Baltimore City, Maryland for more than twenty-five years. In September, 2001, she sought ophthalmic care and treatment for background, diabetic retinopathy, which was present in both eyes,[1] from Dr. Randall V. Wong, at his Baltimore County office. On November 15, 2001, Dr. Wong treated Mrs. Burnside by performing a bilateral laser coagulation procedure. He noted subsequently, during an April 8, 2002 office visit, that Mrs. Burnside's visual acuity was stable. Thereafter, on September 16, 2002, Mrs. Burnside was diagnosed with proliferative diabetic retinopathy, a more advanced form of diabetic retinopathy. Dr. Wong treated this new condition by performing laser coagulation procedures on both eyes.[2] While receiving care and treatment from Dr. Wong, Mrs. Burnside continued to reside in Baltimore City.

Then totally blind in her right eye and legally blind in her left eye, Mrs. Burnside and her husband filed in the Circuit Court for Baltimore City a complaint against Dr. Wong, alleging negligence, breach of informed consent and loss of consortium. Dr. Wong moved to dismiss, arguing, pursuant to Maryland Code (1973, 2002 Repl. Vol) § § 6–201(a)[3] and 6–

---

1. Diabetic retinopathy was defined by the court below:
 "The entry in *Stedman's Medical Dictionary* (28th ed. 2006) entitled 'diabetic retinopathy' states the general definition as 'retinal changes, occurring in diabetes mellitus, marked by microaneurysms, exudates, and hemorrhages, sometimes by neovascularization.'" (citations omitted).

2. On August 21, 2003, Dr. Wong performed a surgical and laser and coagulation procedure on Mrs. Burnside's left eye. On October 9, 2003, Dr. Wong performed a laser coagulation procedure on Mrs. Burnside's right eye. And, on December 18, 2003, he performed another laser coagulation procedure on her right eye.

3. Maryland Code (1973, 2006 Repl. Vol) § 6–201(a) of the Courts and Judicial Proceedings Article provides:
 "*Civil actions.*—Subject to the provisions of §§ 6–202 and 6–203 of this subtitle and unless otherwise provided by law, a civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation."

202(8)[4] of the Courts and Judicial Proceedings Article, that venue was improper. Addressing only section 6–201(a), as the parties had done, the hearing court ruled that venue in Baltimore City was improper and transferred the case to Baltimore County. In her Motion to Reconsider, Alter, Amend or Revise the trial court's ruling, Mrs. Burnside argued that venue was proper under section 6–202(8). In support of that position, Mrs. Burnside attached the affidavit of an expert, Dr. Newsome, who opined that Mrs. Burnside more likely than not suffered the subject eye injury in Baltimore City. Specifically, he said:

"5. It is my opinion to a reasonable degree of medical probability that the first (but not only) eye injury that Mrs. Burnside suffered while under Dr. Wong's care was when her background retinopathy was allowed to progress to proliferative retinopathy, a more severe condition, despite indications for treatment that more likely than not would have prevented that progression. It is my opinion that this transition from background to proliferative retinopathy occurred during April 8, 2002 and September 16, 2002.

"6. This transition from background to proliferative retinopathy was a gradual process. It is my understanding that Mrs. Burnside lived in Baltimore City between April 8, 2002 and September 16, 2002, as well as before and since that timeframe. It is my further understanding that though some of Mrs. Burnside's work activities took her into counties other than Baltimore City at times, she spent far more time in Baltimore City than in any other County during this period.

"7. Based on the foregoing assumptions, and my understanding of the process of the transition from background to proliferative retinopathy, it is my opinion to a reasonable degree of medical probability that Mrs. Burnside's first eye

---

**4.** Section 6–202(8), captioned, *"Additional venue permitted,"* provides: "In addition to the venue provided in § 6–201 or § 6–203, the following actions may be brought in the indicated county: "(8) Tort action based on negligence—Where the cause of action arose[.]"

injury while under Dr. Wong's care occurred more likely than not where she spent the vast majority of her time—in Baltimore City."

The motion was denied, prompting Mrs. Burnside's appeal to the Court of Special Appeals. That court affirmed the trial court's ruling, explaining:

"In our view, the teachings of *Jones [v. Speed,* 320 Md. 249, 577 A.2d 64 (1990)], *Rivera [v. Edmonds,* 347 Md. 208, 699 A.2d 1194 (1997)], and *Green [v. North Arundel Hospital Association, Inc.,* 366 Md. 597, 785 A.2d 361 (2001)] compel the conclusion that Mrs. Burnside suffered an injury, and thus her malpractice claim arose, when Dr. Wong allegedly failed to diagnose her condition on April 8, 2002, in Baltimore County.

\* \* \*

"Just as the plaintiff in *Jones,* Mrs. Burnside sustained an 'injury' when Dr. Wong allegedly failed to diagnose the worsening of her diabetic retinopathy in his office in Baltimore County on April 8, 2002. As explained in *Rivera,* 'any delay' caused by the misdiagnosis is harm where the medical condition was progressing and worsening after the misdiagnosis. Finally, just as the plaintiff in *Green,* Mrs. Burnside's injury occurred on April 8, 2002, even though all of the resulting damage had not occurred at that time. Therefore, we hold that, under section 6–202(8), venue is proper only in Baltimore County."

## II

The majority holds that:

"[U]nder Section 6–202(8) of the Courts and Judicial Proceedings Article, venue is proper in a medical malpractice and lack of informed consent action where the alleged misdiagnosis, negligent treatment, or negligent failure to inform, giving rise to the harm, occurs." [5]

412 Md. 180, 186, 986 A.2d 427, 430 (2009). It reasons:

"The progressively worsening retinopathy and the potentiality of the ultimate harm, the proliferative type, had to coexist at the time of the alleged misdiagnosis, so that the allegation of failure to properly diagnose and treat could not arise absent the presence of the disease and its potentiality. Accepting, for our purposes, that the transition from background to proliferative diabetic retinopathy represents a gradual process, as Dr. Newsome suggests, the disease must have been germinating, as was the disease in *Owens–Illinois, Inc. v. Armstrong,* where we also interpreted the language of arising, 326 Md. [107,] 121, 604 A.2d [47,] 54 [(1992)], for Dr. Wong's negligent acts to constitute misdiagnosis and mistreatment. Therefore, Mrs. Burnside's cause of action arose in Baltimore County, where Dr. Wong's alleged misdiagnosis, mistreatment, and failure to obtain informed consent occurred." (footnotes omitted).

*Id.* at 206–07, 986 A.2d. at 442–43. I disagree with the majority's holding and the analysis underlying it.

Under the Courts and Judicial Proceedings Article, a plaintiff must bring a tort claim based on negligence either: "where the defendant, resides, carries on a regular business, is employed, or habitually engages in a vocation," § 6–201(a), or "[w]here the cause of action arose." § 6–202(8). When section 6–202(8) is the basis for venue, the trial Court, as a threshold matter, has to resolve the factual question, *Rivera v. Edmonds,* 347 Md. 208, 220, 699 A.2d 1194, 1201 (1997); *Hill v. Fitzgerald,* 304 Md. 689, 697, 501 A.2d 27, 31 (1985), of where the "injury" first occurred. " 'Medical injuries'... refers to legally cognizable wrongs or damage arising or resulting from the rendering or failure to render health care," *Oxtoby v.*

---

**5.** The majority further holds "that pursuant to Section 6–201(a) of the Courts and Judicial Proceedings Article, venue is determined when suit is brought, and medical privileges and appointments in Baltimore City, such as in issue in the present case, alone, are insufficient to establish venue in Baltimore City." 412 Md. at 186, 986 A.2d at 430.

*McGowan,* 294 Md. 83, 94, 447 A.2d 860, 866 (1982), and is "concerned with the invasion of legally protected interests coupled with harm." *Id.* This Court previously has faced the issue of deciding exactly when, a critical issue for resolving where, for the purpose of determining venue, an "injury" has occurred. To make the determination of when a person sustains an "injury," this Court follows the test set out in *Rivera v. Edmonds, supra.* There, quoting the intermediate appellate court's opinion in *Edmonds v. Cytology Services of Maryland, Inc.,* 111 Md.App. 233, 270, 681 A.2d 546, 564 (1996), we observed:

> "[T]he patient could suffer an 'injury' as a result of a negligent misdiagnosis, when (1) he or she experiences pain or other manifestation of an injury; (2) the disease advances beyond the point where it was at the time of the misdiagnosis and to a point where (a) it can no longer effectively be treated, (b) it cannot be treated as well or as completely as it could have been at the time of the misdiagnosis, or (c) the treatment would entail expense or detrimental side effects that would not likely have occurred had treatment commenced at the earlier time; or (3) the patient dies."

347 Md. at 215, 699 A.2d at 1198. Significantly, the Court noted that the Court of Special Appeals vacated the summary judgment entered in favor of the defendants, emphasizing that court's rationale for doing so:

> "[Plaintiffs] did not proffer any expert opinion that Ms. Edmonds's cancer had not spread at any time prior to April 9, 1988 (i.e., the date five years prior to the filing of the claim) on April 11, 1985 (i.e., the date five years prior to Ms. Edmonds's death). But [Defendants] did not advance any evidence, beyond conclusory assertions, to show that Ms. Edmonds's cancer *had* advanced during those time periods. Nor do [Defendants] contend that Edmonds suffered any symptoms from the cancer prior to August 1988. Therefore, we conclude that the circuit court erred. . . ."

347 Md. at 215–16, 699 A.2d at 1198, quoting *Edmonds v. Cytology Services,* 111 Md.App. at 272, 681 A.2d at 565. The

Court then proceeded to apply a similar rationale to its resolution of that case:

> "The decision in this case turns on the nature of microscopic cervical cancer, as revealed by the record. Because the standard of care calls for surgery or radiation treatment when the condition is diagnosed, the Defendants contend that any delay, and certainly a protracted delay, caused by a misdiagnosis is a harm within the meaning of *Hill.* Ordinarily we would have no disagreement with that assessment in a case, such as *Jones v. Speed,* 320 Md. 249, 577 A.2d 64, where the uncontradicted evidence on summary judgment is that the undiagnosed cancer was progressing and worsening during the period following the misdiagnosis, even if the cancer was asymptomatic. *Id.* at 256, 577 A.2d at 67.
>
> "Here, however, the evidence most favorable to the party opposing summary judgment is that the cancer that allegedly should have been detected in Mrs. Edmonds in July 1983 could remain dormant for as long as five years. The inference most favorable to the plaintiff is that there are no additional adverse consequences if the microscopic tumor remains unchanged. The Defendants have not attempted to demonstrate that Dr. Rocereto's statement is junk science. Nor did the Defendants develop from him the probability of the undiagnosed condition's remaining dormant for five years."

347 Md. at 222–223, 699 A.2d at 1202. *See Green v. North Arundel Hospital Association, Inc.,* 366 Md. 597, 610, 785 A.2d 361, 369 (2001).

In *Green,* we granted certiorari to resolve in which court, the Circuit Court for Baltimore City or the Circuit Court for Anne Arundel County, venue properly belonged. Both courts had concluded that venue lay in Anne Arundel County.[6]

---

**6.** The Court was also presented with the issue as to whether the trial court erred in precluding the injured plaintiff, who, as a result of his injury, was essentially in a motionless vegetative state, unable either to communicate or to understand the proceeding, from being brought into the courtroom for a period of less than an hour during the two-week

Green, the injured party, was born with "a medical condition in which abnormal accumulation of fluid in the cerebral ventricles caused increased brain pressure." One morning, he began to experience a headache, and later that day, began to vomit and feel nauseous. When his symptoms continued on the following day, his father took him to the North Arundel Hospital Association's (NAHA) emergency room. After examining Green, reviewing the results of an emergency CT scan and consulting with a neurologist, the examining doctor gave him a prescription painkiller and discharged him once the pain was gone. The following day, Green, still complaining of headaches, was taken to a doctor's office in Anne Arundel County and then immediately to the University of Maryland Hospital (UMH) in Baltimore City. While at UMH, he suffered a cardiac arrest, which left him severely brain damaged.

Green filed an action in the Circuit Court for Baltimore City against NAHA and the examining physician at NAHA, although both did business only in Anne Arundel County and the physician resided there. He premised his choice of venue on Section 6–202(8), relying on the fact that it was in Baltimore City that he suffered his cardiac arrest, which he maintained was the injury giving rise to his cause of action. The trial court did not agree. It ruled that Section 6–201(a), rather than Section 6–202(8), was the applicable provision and that, pursuant to that section, venue lay in Anne Arundel County, where the defendants resided and/ or did business. Although the Court of Special Appeals held that Section 6–202(8) applied, it affirmed the judgment for the defendants, concluding that Green's injury occurred in Anne Arundel County. In affirming the intermediate appellate court, this Court explained:

"In answers to interrogatories, the plaintiff averred that, after leaving NAHA and before reporting to UMH the next afternoon, Darwin [Green] suffered a continued 'neurological deterioration' from the ever-increasing intracranial pres-

trial as to liability, to be exhibited to the jury "to demonstrate his current condition."

sure. Although Darwin seeks not to brush it aside, the fact is that, as a result of the alleged negligence of the Anne Arundel County defendants in failing to diagnose the shunt malfunction and have plaintiff sent immediately to a facility capable of dealing with that problem, Darwin continued to suffer from headaches, drowsiness, and neurological deterioration. That constitutes a 'hurtful or damaging effect' (*Oxtoby*); it is the kind of harm we recognized in *Jones* as construing an injury; and it clearly falls within the scope of 'pain or other manifestation of an injury' under *Rivera.* Clearly, Darwin, through his parents, could have sued the NAHA defendants on [the day they saw Darwin]."

The Court further stated:

"It is evident that the Court of Special Appeals reached the only conclusion possible—that because appellant's own evidence showed that Darwin *first* experienced injury in the form of 'neurological deterioration' and pain and suffering in Anne Arundel County, the cause of action arose in that County. Venue thus lay in Anne Arundel County, and no error was committed by the Circuit Court for Baltimore City in transferring the case." (citations omitted)

*Green,* 366 Md. at 612, 785 A.2d at 369–70.

### III

In the instant case, as in *Green,* we must determine, for the purpose of establishing venue under Section 6-202(8), where Mrs. Burnside's injury occurred. An injury may be either symptomatic or asymptomatic. *Webster's Third New International Dictionary* 2318 (2002), defines a symptomatic condition as "being a symptom of a disease; characteristic, indicative." An asymptomatic condition, on the other hand, is one "presenting no subjective evidence of disease." *Id.* at 136.

The injury in *Green* was, the majority in effect held, symptomatic. The plaintiff's painful headaches were symptomatic of an injury and evidence that the plaintiff had suffered an injury at NAHA as a result of the negligent misdiagnosis he alleged. There is no such symptom of injury in Mrs. Burn-

side's case. That she suffered with diabetic retinopathy is not in dispute. That her diabetic retinopathy progressed to proliferative retinopathy also is not in dispute. Moreover, the record does not reflect that this progression was accompanied by any visible or tangible manifestation that it was occurring. On the contrary, the progression to proliferative retinopathy was without any apparent symptoms; it was asymptomatic. The critical question, therefore, is when, at what point did, Mrs. Burnside's diabetic retinopathy disease advance beyond the point where it was at the time of misdiagnosis to a point where it (a) could no longer effectively be treated or (b) it could no longer be treated as well or as completely as it could have been at the time of misdiagnosis. *Edmonds v. Cytology Services*, 111 Md.App. at 270, 681 A.2d at 564.

*Green* teaches that a plaintiff who experiences pain before, during and after a misdiagnosis, suffers an "injury" for venue purposes, under Section 6–202(8); the injury and misdiagnosis coincide.[7] 366 Md. at 612, 785 A.2d at 370. The majority extends the *Green* holding to a plaintiff whose injury is asymptomatic, who neither experiences pain nor otherwise manifests symptoms of an injury, reasoning that the injury, in this case, the "progressively worsening retinopathy and the potentiality of the ultimate harm, the proliferative type," 412 Md. at 206, 986 A.2d at 442, must have coexisted with the misdiagnosis. Thus, after the decision in the instant case, in misdiagnosis cases, venue always will lie at the site of the misdiagnosis, whether or not there are manifestations of the injury, whether it is symptomatic or asymptomatic. This interpretation of injury renders the test announced in *Edmonds* and adopted by this Court, as well as Section 6–202(8), meaningless. I addressed this very concern in my dissent in *Green:*

---

**7.** I did not agree with *Green* when it was decided—I dissented—and I continue to be skeptical of its accuracy. For purposes of this dissenting opinion, however, I accept its teaching. As I explain, *infra, Green* does not support the majority's analysis or the result it reaches.

"[The *Edmonds*] test provides alternative methods, depending upon the existing circumstances, of determining when an 'injury' has occurred. To be sure, one alternative applies when the plaintiff experiences pain or other manifestation of an injury. But that alternative must be juxtaposed against the alternative that applies when the injury has progressed beyond the point at which it was at diagnosis, such that it cannot then be treated or treatment would be more difficult or expensive. The latter alternative must apply to the situation in which the misdiagnosis is of an asymptomatic injury. Logically, a different test, at least as difficult to prove, must apply when the condition that is misdiagnosed is symptomatic. That test, I submit, must require proof that the pain being experienced indicates a deterioration of the condition beyond where it was when the diagnosis was made."

*Green*, 366 Md. at 639, 785 A.2d at 386.

In *Oxtoby*, we stated that an "injury" is the "effect on the recipient in the way of hurt or damage." 294 Md. at 94, 447 A.2d at 866. The only hurt or damage being experienced by Mrs. Burnside when her condition was misdiagnosed was the background retinopathy with which she already was suffering; that, not the deterioration of the existing eye disease to a point affecting treatment or Mrs. Burnside's treatment prospects or the resulting progression itself of the condition to proliferative retinopathy, was the only condition that coexisted with Dr. Wong's misdiagnosis. Indeed, there was expert evidence that the progression of Mrs. Burnside's background retinopathy to proliferative retinopathy occurred some time after the misdiagnosis and before the discovery of her injury. To be an "injury," within the contemplation of section 6–202(8), there must have been a progression of Mrs. Burnside's background retinopathy to a more serious condition; the status of Mrs. Burnside's retinopathy must have deteriorated significantly from what it was when the faulty diagnosis was made. Where there is no pain or other objective and overt manifestation of injury, that means deterioration "beyond the point at which it was at diagnosis, such that it cannot then be

treated or treatment would be more difficult or expensive," *Green,* 366 Md. at 639, 785 A.2d at 386 (Bell, C.J., dissenting), than it would have been had the diagnosis been correct. Thus, Mrs. Burnside's injury could not have arisen until, as a result of Dr. Wong's misdiagnosis, she was caused greater harm than that she was experiencing at the time of diagnosis. That,—according to the only expert testimony—, more likely than not occurred in Baltimore City, where Mrs. Burnside spent the majority of her time.

Moreover, it is well settled that an 'injury' "refers to a legally cognizable wrong or damage resulting from the rendering or failure to render health care." *Oxtoby,* 294 Md. at 94, 447 A.2d at 866; *See also Hill,* 304 Md. at 695–96, 501 A.2d at 30. It follows that a misdiagnosis and "injury" cannot co-exist. You cannot simultaneously have an asymptomatic injury resulting from a failure to diagnose.[8] Unless it is sympto-

---

**8.** The majority apparently believes that the critical condition for the purpose of determining when injury occurred is Mrs. Burnside's background diabetic retinopathy, the symptom of which simply progressively worsened. Thus, the majority disputes that Mrs. Burnside's condition was asymptomatic, relying, for support, on Mrs. Burnside's expert's affidavit that indicated that "she presented to Dr. Wong with symptoms of background diabetic retinopathy, from which proliferative retinopathy gradually progressed." *Burnside v. Wong,* 412 Md. 206 n. 13, 986 A.2d 442 n. 13. But that is just the point, Mrs. Burnside, when misdiagnosed, was suffering from background diabetic retinopathy, not proliferative retinopathy, an aggravated form of diabetic retinopathy. Background diabetic retinopathy and proliferative diabetic retinopathy are different. Diabetic retinopathy "is divided into two groups: non-proliferative diabetic retinopathy consisting of blot, dot hemorrhages, exudate, and macular edema; and proliferative diabetic retinopathy consisting of abnormal new vessels and fibriotic tissue." *Taber's Cyclopedic Medical Dictionary* 2027 (21st ed. 2005). Background diabetic retinopathy is "characterized by progression of microaneurysm, intraretinal punctate hemorrhages, yellow exudates, cotton-wool spots, and sometimes macular edema that can compromise vision." *Dorland's Medical Dictionary* 1659 (31st ed. 2007). Proliferative retinopathy, on the other hand, is "characterized by neovascularization of the retina and optic disk, proliferation of fibrous tissue, vitreous hemorrhage, and eventually retinal detachment with blindness." *Id.* Background diabetic retinopathy is not listed as a characteristic of proliferative retinopathy. Much as the majority may want it to be so, a condition presently being suffered is not a symptom of an aggravated, progressive form of that condition; background

matic, *Green,* 366 Md. at 612, 785 A.2d at 370, an "injury" resulting from a misdiagnosis cannot "coexist" with the misdiagnosis, the result of the misdiagnosis simply cannot precede or coincide with the diagnosis. It must occur after the misdiagnosis has been made.

The majority states, further, that "[i]n *Oxtoby,* we conceived 'injury' in the context of a progressive illness, ovarian cancer, in terms of 'the effect on the recipient in the way of hurt or damage,' and noted that 'a medical injury occurs … even though all of the resulting damage to the patient' has not yet occurred." 412 Md. at 205–06, 986 A.2d at 442. I do not disagree with this statement. I simply disagree with the majority's application of the *Oxtoby* decision to the instant case. I do not contend that Mrs. Burnside's injury occurred at the time she discovered that her background retinopathy had progressed to proliferative retinopathy; injury-deterioration of the status quo of the disease at diagnosis-undoubtedly had occurred prior to that discovery. Moreover, I agree with *Rivera,* which the majority cites to support its holding, in which we rested "on the nature of microscopic cervical cancer, as revealed by the record." 347 Md. at 222, 699 A.2d at 1202. The decision in this case, likewise, must rest on the nature and

diabetic retinopathy simply is not a symptom of proliferative retinopathy.

It is not surprising that Mrs. Burnside was displaying symptoms of background diabetic retinopathy. Similarly, it is not surprising, not to mention logical, that she was not displaying symptoms of proliferative retinopathy, a progression to which the condition she was suffering, gradually could, but need not, develop. The question is when did this process of gradual progression become an injury within the contemplation and meaning of *Rivera v. Edmonds, supra* and *Oxtoby v. McGowan,* 294 Md. 83, 447 A.2d 860?; when, in other words, did the symptoms of background diabetic retinopathy develop into symptoms of proliferative retinopathy? That question must answered in light of the fact that the diagnosis of Mrs. Burnside's visual acuity following an April 8, 2002 office visit was that it was stable.

On another note, the majority's protestations that this case involves, like *Green,* a symptomatic condition is concession that there is a difference in analysis and perhaps result, depending upon which— symptomatic or asymptomatic—the condition happens to be. If it is not a concession, one can only wonder why the majority bothers to raise the issue at all.

the progression of Mrs. Burnside's proliferative retinopathy, as revealed by the record. And the record in this case contains expert opinion, offered by Mrs. Burnside, that she was injured when her existing eye injury, the background retinopathy, was allowed to progress to proliferative retinopathy, that was a gradual process that occurred between April 8, 2002 and September 16, 2002 and that, during this period, Mrs. Burnside "resided in Baltimore City and spent nearly all of her leisure time there." She estimated that "she spent more than seventy-five percent . . . of the total hours in any given week in Baltimore City." There is no other "medical opinion, medical record, or medical testimony" to suggest otherwise.

The evidence in this case is the exact opposite of that found in *Jones v. Speed*, "where . . . the uncontradicted evidence on summary judgment was that the undiagnosed cancer was progressing and worsening during the period following the misdiagnosis, even if the cancer was asymptomatic." *Rivera*, 347 Md. at 223, 699 A.2d at 1202. Although I believe that the record in this case suggests that the progression of Mrs. Burnside's disease occurred some time after the misdiagnosis and before the discovery of the injury, at the very least whether it did is a jury question.

My view is consistent with how other jurisdictions have defined "injury" resulting from a misdiagnosis. *Estate of Genrich v. OHIC Ins. Co.*, 318 Wis.2d 553, 769 N.W.2d 481, 487 (2009) (". . . an actionable injury arises when the [negligent act or omission] causes a greater harm than [that which] existed at the time of the [negligent act or omission]"); *Paul v. Skemp*, 242 Wis.2d 507, 625 N.W.2d 860, 870 (2001) ("[T]he misdiagnosis [in a medical malpractice action] is the negligent act or omission. The misdiagnosis is not the injury. The misdiagnosis may or may not result in an injury; and, that injury may occur concurrently, or there may be a delay between the misdiagnosis and the injury.").

I continue of the view I expressed, in dissent, in *Green*, the majority's interpretation renders the "venue statute a nullity

because [under its analysis] an action for misdiagnosis of" any condition, whether symptomatic or asymptomatic, "would necessarily, and always, have to be brought where the misdiagnosis occurred." 366 Md. at 640, 785 A.2d at 386. Therefore, I dissent.